**S & M BRANDS, INC., Plaintiff,**

v.

**STATE of Georgia EX REL. Christopher M. CARR, Attorney General, Defendant.**

**CIVIL ACTION NO. 1:16–CV–4469–SCJ**

United States District Court,
N.D. Georgia, Atlanta Division.

Signed 05/30/2017

Bryan Michael Haynes, Troutman Sanders–VA, LLP, Richmond, Seth T. Ford, Rebecca Halle Silk, Troutman Sanders, LLP–ATL, Atlanta, GA, for Plaintiff.

Daniel S. Walsh, Office of State Attorney General Department of Law State of Georgia, Forrest Geoffrey Pearce, Georgia Department of Law Office of the Attorney General, Robin Ginsburg Cohen, State of Georgia Law Department, Atlanta, GA, for Defendant.

### ORDER

HONORABLE STEVE C. JONES, UNITED STATES DISTRICT JUDGE

Before the Court in this 42 U.S.C. § 1983 case is the State of Georgia's motion to dismiss S & M Brands, Inc.'s complaint. Doc. 17.[1] S & M, a tobacco product

---

1. All citations are to the electronic docket, and all page numbers are those imprinted by the Court's docketing software.

manufacturer, asserts that pieces of Georgia's tobacco regulatory regime violate the Constitution's Contracts and Equal Protection Clauses, as well as state law. Georgia insists that those causes of action all fail, either because the Court lacks subject matter jurisdiction, or because they do not state claims. Because the State is correct on both scores, its motion is **GRANTED** and S & M's complaint **DISMISSED**.

## I. BACKGROUND [2]

In 1998, 52 jurisdictions, including Georgia, entered into a Master Settlement Agreement (MSA) with large tobacco manufacturers to resolve lawsuits brought to recover smoking-related health care costs. Doc. 1 at 4. Manufacturers that signed the MSA are "participating manufacturers" (PMs), while those, like S & M, who did not are "non-participating manufacturers" (NPMs). Id. at 5. PMs agreed to make settlement payments to settling states in perpetuity (id.) and limit their "advertising, sponsorship, lobbying, and litigation activities," among other restrictions. KT & G Corp v. Att'y Gen. of State of Okla., 535 F.3d 1114, 1119 (10th Cir. 2008); Doc. 1 at 6. NPMs, on the other hand, make no settlement payments and suffer no limitations on their First Amendment activities.

The MSA contains a number of provisions designed to counterbalance the competitive disadvantages it imposed on PMs [3] and "protect the public health gains [it] achieved." Doc. 1–1 at 55. One, the "NPM Adjustment," reduces settlement payments by PMs if they experience market share

loss "as a result of the provisions of" the MSA. Id. at 56. PMs "shall not be subject to an NPM Adjustment" in a given settling state, however, if the state enacts and diligently enforces a "Qualifying Statute." Id. at 58–59. The MSA, in turn, defines that as a statute "that effectively and fully neutralizes the cost disadvantages that the [PMs] experience vis-a-vis [NPMs] . . . as a result of the provisions of" the MSA. Id. at 58–60. The MSA stipulates that its Model Escrow Statute, "if enacted without modification or addition . . . shall constitute a Qualifying Statute." Id. at 60.

### A. Georgia's Qualifying Statute

Georgia enacted that Model Escrow Statute after finding that "[c]igarette smoking presents serious public health concerns" that create "serious financial concerns for the state" which are best "borne by tobacco product manufacturers." See O.C.G.A. § 10–13–1(a)-(d). The legistlature also concluded that "[i]t would be contrary to the policy of the state if tobacco product manufacturers who determine not to enter into such a settlement could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the state will have an eventual source of recovery from them if they are proven to have acted culpably." O.C.G.A. § 10–13–1(f). Under Georgia's Qualifying Statute, then, NPMs can either sign the MSA and become a PM, or remain an NPM and deposit money (approximately $0.02 per

---

**2.** A little more than four months ago, the Court denied S & M's motion for preliminary injunction. Doc. 26. Rather than reinvent the wheel, because of its direct applicability, and to avoid any cross-reference induced confusion, this Order liberally cribs from the Court's previous work. In particular, the Background section and portions of the Contracts Clause and Equal Protection analyses mirror those in the preliminary injunction order.

**3.** The settlement payments PMs make forced them to raise prices on their tobacco products. Had the MSA not compensated for that, NPMs could maintain their profit margins at a lower price point than PMs. Hence, the competitive disadvantage PMs would face because of the decision to settle.

cigarette sold) into a "qualified escrow fund." O.C.G.A. § 10–13–3.

A "qualified escrow fund" is

an escrow arrangement with a federally or state chartered financial institution having no affiliation with any tobacco product manufacturer and having assets of at least $1 billion where such arrangement requires that such financial institution hold the escrowed funds' principal for the benefit of releasing parties and prohibits the tobacco product manufacturer placing the funds into escrow from using, accessing, or directing the use of the funds' principal except as consistent with subparagraph (B) of paragraph (2) of Code Section 10–13–3. *The principal balance in the qualified escrow fund must always be maintained so that both the face value and the cost basis of the account are each equal to or greater than the accumulated principal deposits.*

O.C.G.A. § 10–13–2(7) (emphasis added); see also O.C.G.A. § 10–13A–2(14) (same). NPMs "shall receive the interest and other appreciation on such funds," but the "funds themselves shall be released from escrow only": (1) to pay a judgment or settlement of a claim that the MSA released if asserted against a PM; (2) if the amount placed in escrow exceeded the amount a PM would have paid under the MSA (only the excess amount is released); or (3) after 25 years. O.C.G.A. § 10–13–3(B).

NPMs must make quarterly escrow deposits, while PMs pay annually. Doc. 1 at 16; O.C.G.A. § 10–13–3(2)(A). NPMs also must appoint and maintain a registered agent for service of process, while PMs need not. Doc. 1 at 17; O.C.G.A. § 10–13A–3(d)(1). Finally, NPMs, but not PMs, must post a bond—which the State may execute if the NPM misses an escrow deposit—the amount of which "shall be the greater of: (1) Fifty thousand dollars; or (2) The highest amount of escrow owed in Georgia by the nonparticipating manufacturer or its predecessor in the last 12 quarters." O.C.G.A. § 10–13A–7(b).

## B. Georgia's Model Escrow Agreement

Georgia's Attorney General plays an integral role in administering and enforcing the escrow statute. He maintains a directory of approved tobacco manufacturers (O.C.G.A. § 10–13A–4), receives annual compliance certifications from those manufacturers (O.C.G.A. § 10–13A–3), and reviews and approves all proposed escrow agreements. Id. at (d). He also has authority to promulgate rules and regulations necessary to implement the escrow statute. O.C.G.A. § 10–13A–8(f); see also O.C.G.A. § 10–13A–10(c) ("The Attorney General may promulgate rules and regulations necessary to effect the purposes of this chapter.").

To "facilitate compliance" with "qualified escrow fund" requirements, and pursuant to his review authority, the Attorney General promulgated a Model Escrow Agreement "for use by NPMs and their escrow agents." Doc. 14 at 7. Among other things, that agreement "restricts the types of investments that may be included in an NPM's escrow account." Id. The State concedes that "[t]he AG will not approve an escrow agreement unless it limits the investments in an NPM's escrow account consistently with the model escrow agreement." Id.

From 1998 until recently, the model agreement provided that:

The escrow agent shall invest and reinvest all amounts from time to time credited to the Accounts in (a) the Escrow Agent's U.S. Treasury money market fund; (b) direct obligations of, or obligations the principal and interest on which are unconditionally guaranteed

by, the United States of America; (c) repurchase agreements fully collateralized by securities described in clause (b) above; (d) money market accounts maturing within 30 days of the acquisition thereof and issued by a bank or trust company organized under the laws of the United States of America or any of the 50 states thereof (a "United States Bank") and having combined, capital, surplus and undistributed profits in excess of $500,000,000; (e) demand deposits with any United States Bank having combined capital, surplus and undistributed profits in excess of $500,000,000. Doc. 1–7 at 10. Those investment terms "are modeled on and nearly identical to the investment terms negotiated by the Settling States and the PMs for the investment of MSA funds." Doc. 1 at 12. And in compliance with those terms, S & M's current investment mix includes U.S. Treasury bonds maturing thirty years from date of purchase. Doc. 1 at 13.

In August 2016, however, the Georgia Legislature began to require that an escrow fund's "principal balance" never diminish to the "qualified escrow fund" definition. O.G.G.A. § 10–13–2(7). In response, the Attorney General changed the Model Escrow Agreement. Now, "permitted investments" are "limited to the following: (a) United States Treasury Securities, (b) cash, or (c) Money Market Fund." Doc. 1–8 at 4. "United States Treasury Securities" in turn means "bills, notes, and bonds issued by the United States Treasury (i) maturing no more than (20) twenty years from the date of purchase . . . ." Id. at 5. Investment vehicles for MSA funds escrowed by PMs have not been similarly limited. Doc. 1 at 13.

## C. S & M's Complaint

On August 2, 2016, the Attorney General notified S & M and other NPMs that they had to submit new escrow agreements that mirrored the Revised MEA no later than September 1, 2016. Doc. 1–2. After negotiations, the Attorney General agreed to extend S & M's deadline until December 16, 2016. Eventually it became clear that the parties would not be able to reach an agreement on permitted investments before that deadline. S & M filed its Complaint on December 2, 2016. Doc. 1.

In it, S & M asserts seven claims. It first contends that imposition of the Revised MEA, by forcing S & M to terminate its existing escrow agreement with SunTrust Bank, amounts to an unconstitutional impairment of contract. Doc. 1 at 25. Because the Revised MEA more severely restricts NPM escrow investments than the MSA limits PM escrow investments, it also, says S & M, violates the Equal Protection Clause. Id. at 27. Regardless of the Revised MEA's constitutional infirmities, S & M insists that the Attorney General simply lacks legal authority to "draft and dictate" that agreement. Id. at 28–29. His doing so thus amounts to a void *ultra vires* action. Id.

In its remaining four claims, S & M asserts that (1) the agent appointment, bond, quarterly deposit, and delisting provisions of the escrow statute applicable to NPMs, but not PMs, violate the Equal Protection Clause; (2) the State's § 1983 violations warrant attorney's fees under 42 U.S.C. § 1988; (3) the State has illegally retained excess funds S & M deposited in escrow in violation of the First and Fourteenth Amendments; and (4) the retention of funds also violates O.C.G.A. § 10–13–2(B)(ii). Doc. 1 at 30–35.

S & M sought preliminary injunctive relief (doc. 4) staying the Revised MEA's effectiveness. The Court denied that motion because S & M failed to show a likelihood of success on the merits of its Contracts Clause, Equal Protection, and *ultra vires* claims. Doc. 26. A month before that Order issued (the State had agreed to

pause implementation of the Revised MEA for a short time), the State moved to dismiss. Doc. 17. It contends that the Court lacks subject matter jurisdiction to decide Counts Three, Six, and Seven, while it contends S & M's remaining counts fail to state claims. Doc. 17–1.

## III. STANDARD OF REVIEW

The State seeks dismissal of the complaint under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). See doc. 17–1 at 2–3. To survive the latter, and comply with Federal Rule of Civil Procedure 8(a)(2), complaints must contain "only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In deciding whether claims comply, courts must "accept[ ] the [factual] allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." Boyd v. Warden, Ala. Dep't of Correctional, 856 F.3d 853, 864, 2017 WL 1856071, at *5 (11th Cir. May 9, 2017). Conclusory allegations, however, are not entitled to that assumption of truth—they "must be supported by factual allegations." Bishop v. Ross Earle & Bonan, P.A., 817 F.3d 1268, 1270 (11th Cir. 2016).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127 S.Ct. 1955. To avoid dismissal, "a complaint," in other words, "must 'state a claim to relief that is plausible on its face,' meaning it must contain 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Bishop 817 F.3d at 1270 (quoting Ashcroft v. Iqbal,

556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

Rule 12(b)(1) motions[, by contrast,] come in two flavors. They "can be asserted on either facial or factual grounds." Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1279 (11th Cir. 2009). Facial attacks on subject matter jurisdiction are subject to the same standard of review as 12(b)(6) motions. Gupta v. McGahey, [709 F.3d 1062, 1064 (11th Cir. 2013) ] (citing Carmichael, 572 F.3d at 1279). Attacks on the factual underpinnings of jurisdiction, on the other hand, may allow a court to "consider extrinsic evidence such as deposition testimony and affidavits." Carmichael, 572 F.3d at 1279. And with factual attacks, "the burden is on the plaintiff to prove that jurisdiction exists." Gibbs v. United States, 865 F.Supp.2d 1127, 1135 (S.D. Fla. 2012) (quoting OSI, Inc. v. United States, 285 F.3d 947, 951 (11th Cir. 2002)).

Roberts v. Wells Fargo Bank, N.A., No. 4: 12–CV–200, 2013 WL 1233268, at *4 (S.D. Ga. Mar. 27, 2013).

## III. ANALYSIS

The State divides S & M's claims into three buckets: one for assaults on the Revised MEA, another for an Equal Protection claim against four other escrow-related laws and administrative rules, and a third for S & M's claims that seek the return of alleged escrow overpayments. The first two buckets rest on 12(b)(6) justifications, while this Court, says the State, lacks subject matter jurisdiction over S & M's overpayment claims.

### A. Constitutional Claims—the Revised MEA

The State insists that S & M's Contracts and Equal Protection Clause attacks against the Revised MEA fail to state

claims. Doc. 17–1 at 16. Equal protection affords S & M no succor, says the State, because PMs and NPMs are not similarly situated, and because the purposes behind the revision—ensuring a source of recovery for the state, and simplifying the Attorney General's process for "determining that ... investments are of the types permitted"—provide a rational basis for the regulatory shift. See id. at 16–18. The State believes that the Revised MEA survives Contracts Clause scrutiny because it imposes no substantial impairment on S & M's escrow agreement with SunTrust. Id. at 22.

S & M, on the other hand, contends that it and other NPMs are "similarly situated to PMs because both [must] ... deposit funds into escrow accounts for the same statutory purpose—to ensure adequate funds for potential recovery." Doc. 21 at 6. Yet, only NPMs suffer the Revised MEA's "severely alter[ed] permitted investments." Id. at 7 (quotes omitted). PMs remain unaffected. Id. That "differential treatment" lacks a rational justification, says S & M, and thus suffices to state the second element of an Equal Protection claim. Id.

What's more, S & M notes, the State's "justifications [for promulgating the Revised MEA] are outside the four corners of the Complaint and thus outside 12(b)(6) review." Doc. 21 at 8. Even if they were not, the State includes no "evidentiary support whatsoever." Id. S & M insists that its complaint should survive even in the face of State-supportive evidence because the State's reasons are "so arbitrary and irrational that [they] fail[ ] rational basis review." Id.

S & M, however, thinks the Revised MEA triggers heightened, not rational basis, scrutiny. Doc. 21 at 10. The State's, it says, penalizes NPMs because "they have not waived their First Amendment commercial free speech rights by signing the MEA." Id. It never pursued direct mone-

tary compulsion (e.g., a fine), but that is not necessary to find a First Amendment violation. Id. at 10–11. All that matters is that the Revised MEA imposes a significant and unjustified burden on tobacco product manufacturers' speech. Id. at 11 (citing Pitt News v. Pappert, 379 F.3d 96 (3d Cir. 2004)).

Fast forward to the Contracts Clause. The State's opposition to that claim fails, S & M says, because "incidental" effects on contracts can amount to a constitutionally significant impairment. Doc. 21 at 3–4. The State's other reasons for why the Revised MEA is not a "substantial" impairment also fail to persuade. Id. at 4–5. Hence, the State "bears the burden of establishing a significant and legitimate purpose for the impairment and that the impairment is based on reasonable conditions." Id. The State has not met that burden and thus S & M's Contracts Clause claim, it urges, should be allowed to proceed. But first, equal protection.

### 1. *Equal Protection*

The Fourteenth Amendment to the Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." At bottom, "[t]he Equal Protection Clause requires the government to treat similarly situated persons in a similar manner." Leib v. Hillsborough Cty. Pub. Transp. Comm'n, 558 F.3d 1301, 1305 (11th Cir. 2009). "The reason that there is a 'similarly situated' requirement in the first place is that at their heart, equal protection claims ... are basically claims of discrimination. To maintain this focus on discrimination, and to avoid constitutionalizing every state regulatory dispute, [courts] are obliged to apply the 'similarly situated' requirement with rigor. 'Different treatment of dissimilarly situated persons does not violate the equal protection clause.' " Griffin Indus., Inc. v. Irvin, 496

F.3d 1189, 1207 (11th Cir. 2007); see also Miadeco Corp. v. Miami–Dade Cty., 249 F.Supp.3d 1296, 1301–02, 2017 WL 1319576, at *3 (S.D. Fla. Apr. 10, 2017) ("[W]here individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant ... to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued.").

▮▮▮ Assuming similarly situated persons exist, "[w]hen legislation classifies persons in such a way that they receive different treatment under the law, the degree of scrutiny the court applies depends upon the basis for the classification." Leib, 558 F.3d at 1306. "If a law treats individuals differently on the basis of race or another suspect classification, or if the law impinges on a fundamental right, it is subject to strict scrutiny. Eide v. Sarasota County, 908 F.2d 716, 722 (11th Cir. 1990)." Id. "In areas of social and economic policy," however, "a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

### i. Similarly situated

▮▮▮ It is one thing to say as a general matter that individuals raising equal protection challenges must share characteristics with others in order to show unequal treatment. But "what degree of similarity is required for two entities to be considered 'similarly situated,'" particularly when the challenged government decision involved multiple factors? Griffin, 496 F.3d at 1203. With "one-dimensional deci-sion[s]," like public utility easements or tax assessments as a percentage of market value, comparators need not be identical twins. Id. One neighborhood resident might be old, rich, and live in a mansion with a manicured lawn. His next door neighbor might live in a double-wide trailer, be twenty-five, and have a yard of knee high weeds. But if the city they live in requires the rich man to grant a thirty-three foot easement to connect to municipal water, then demands a fifteen foot one from the poor man and everyone else in the neighborhood, the discrimination—and thus the two neighbors legally relevant similarities—is palpable. See Village of Willowbrook v. Olech, 528 U.S. 562, 565, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

When "regulatory action [is] ... multidimensional, involving varied decisionmaking criteria," courts cannot use "a simplistic, post-hoc caricature of the decisionmaking process." Griffin, 496 F.3d at 1203. In Campbell v. Rainbow City, for example, a developer sued a city over a zoning variance denial, allegedly because the developer ran unsuccessfully against the city's mayor. 434 F.3d 1306, 1308 (11th Cir. 2006). To prevail on his equal discrimination claim the developer, who proposed building a 144–180 unit apartment complex, had to show that similar projects received approval.

He failed because his proposed comparators lacked relevant similarities. Campbell, 434 F.3d at 1308. One similarly sized development that also proposed a multifamily use for its property sought different and fewer zoning variances than Campbell. Id. at 1316. Another fell short of similarly situated at least in part because, unlike Campbell, its developer brought development plans and an engineer and architect to planning commission meetings. Id. Other comparators that the court found dissimilar were commercial, not residential,

were not "essentially the same size," had different impacts on the community, or sought different action from the city (i.e., a different zoning variance, approval from a different commission, etc.). Id. at 1316–17.

PMs and NPMs, like the various developments in Campbell, are not similarly situated. Both types of tobacco manufacturers deposit money into escrow accounts. But they do so for two different reasons. PMs deposit money that they contractually owe settling states under the MSA. That money remains in escrow for only a short period of time (days or weeks, not years) before transferring to the states. See doc. 1–1 at 84–85, 91.

NPMs, by contrast, escrow funds for up to twenty-five years pursuant to a state statute, in part so that a reserve exists to provide for any future claims related to their tobacco products. It's true, as S & M observes, that the MSA and Georgia's escrow statute have similar purposes (shifting tobacco-related healthcare costs from states to tobacco product manufacturers), but the escrow requirements PMs and NPMs operate under exist for different reasons. The PM escrow requirement facilitates payments to states, while the NPMs' insures the availability of funds that may or may not ever transfer to the State (it also, as discussed above, eliminates any competitive advantage NPMs gained by not agreeing to the MSA). Indeed, NPMs continue to own the money they deposit— PMs as a general rule (if they dispute the amount owed, that money goes into escrow, but does not immediately transfer to the settling state) do not.

As the Tenth Circuit observed in KT & G Corp. v. Att'y Gen. of State of Okla.:

> For those manufacturers sued by [the states] for wrongdoing, the Master Settlement Agreement mandates not only strict conduct restrictions but also nonrefundable payments in perpetuity.
>
> * * *

> In contrast, nonparticipating manufacturers are subject to no conduct restrictions, and their payments in escrow last for only 25 years. In addition, these manufacturers receive interest on the funds while they are held in escrow, and the principal is fully refundable if the money is not needed to pay a judgment in a tobacco-related law-suit. Thus, the refundability of the payments is directly related to the nonparticipating manufacturers' future liability for tobacco-related losses.
>
> Thus, the distinctions between manufacturers signing the Master Settlement Agreement and manufacturers not signing are rationally related to their status *vel non* as defendants, their willingness to agree to conduct limitations, and [the states'] need to ensure a source of recovery for all future tobacco-smoking related healthcare costs. *All manufacturers thus bear responsibility in differing manners and degrees for limiting the [states'] future liability for these costs.* Those manufacturers who have not admitted to any wrongdoing and who do not wish to limit their future conduct retain the ability to manufacture and market their product in the manner they pursued before, but they essentially provide a surety bond against future liability for tobacco-smoking related healthcare costs.

535 F.3d 1114, 1139–40 (10th Cir. 2008) (quoting Star Scientific, Inc. v. Beales, 278 F.3d 339, 351–52 (4th Cir. 2002) (emphasis added)).

Again, valid comparators, for equal protection purposes, must be "similarly situated *in all relevant respects.*" Griffin, 496 F.3d at 1204 (emphasis in original). PMs and NPMs simply aren't. Yes, they both manufacture tobacco products. Yes, they both deposit money in escrow accounts. Those, however, are irrelevant similarities

when evaluating whether the Revised MEA violates equal protection principles.

The only relevant similarities (in this case, differences) in evaluating whether the Revised MEA violates the Equal Protection Clause are those surrounding a given manufacturer's relationship to the MSA and "their status *vel non* as defendants." KT & G, 535 F.3d at 1140; see also id. ("Thus, the refundability of the payments is directly related to the [NPMs'] future liability for tobacco-related losses."). The MSA mandates PM payments. It limits PM conduct, and provides other safeguards (contractual remedies) the State may rely on. Without the escrow statutes (and its implementing devices, like the Revised MEA, annual compliance certifications, delisiting, and noncompliance fines), no similar mechanisms exist to ensure that NPMs remain able to fund any claims related to the healthcare costs their products create.

Like employees alleging workplace discrimination, who "may perform similar functions in different ways," and thus may generate different employer treatment, two otherwise similar tobacco product manufacturers may stand in different positions vis-a-vis the MSA and thus, too, their potential liability for future tobacco-related health care costs. Griffin, 496 F.3d at 1204 (citing Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316–19 (11th Cir. 2003)). Those differences, just like two employees' different punctuality standards, in turn justify differential treatment by the State. That creates differential situations, and that dooms S & M's equal protection claim.

### ii. Heightened Scrutiny

■ Even if PMs and NPMs are similarly situated, the Revised MEA is rationally related to the legitimate state interests of promoting health and recovering costs for tobacco-related illnesses. See Grand River Enters. Six Nations, Ltd. v.

Pryor, 425 F.3d 158, 175 (2d Cir. 2005). Implicit in that conclusion: heightened scrutiny does not apply because the Revised MEA does not compel or "needlessly encourage" S & M to sign the MSA and agree to limitations on its commercial speech rights, or penalize it for not doing so.

In its preliminary injunction briefing (which contains more detailed argumentation on the appropriate level of scrutiny to apply) S & M argued that the Revised MEA's investment restrictions impose a disproportionate financial burden on NPMs by reducing returns on escrowed funds. Doc. 3–4 at 14. Disproportionate to what though? Certainly not PMs, who must pay settling states money they will never get back. See KT & G, 535 F.3d at 1135 ("Plaintiffs are no worse off financially than if they had joined the MSA."). NPMs, by contrast, eventually receive every penny back of the money they escrow, assuming of course that no claims eat away at those funds. What's more, NPMs place in escrow no more than PMs pay under the MSA. If they do deposit more than they would have paid, the excess is refunded (at least that's what the statutory scheme provides for).

A simple example illustrates how the Revised MEA places no greater burden on NPMs than PMs suffer under the MSA. Imagine an NPM that pays $100 into escrow. It owns those funds, and even under the Revised MEA, it earns interest income (if slightly less, *maybe*, than it would have under the original MEA) on them until their eventual return twenty-five years down the road (again, assuming no claims are made against the deposits). Here's the kicker though: the NPM retains the ability to advertise as it sees fit.

Had the NPM signed the MSA, it would have paid approximately the same $100, but to the states, not into its own escrow

account. It would never get that money back, claim or no claim. And, it would labor under advertising restrictions in perpetuity.

If no claims were ever made on the escrowed funds, the NPM who never signed the MSA would recover its $100, plus twenty-five years worth of interest. The signing NPM would be out $100 and would have earned almost no interest. Even if the non-signing NPM earned zero interest income, they would still be in a better position than a signatory *and* they would retain their First Amendment rights. If any party in that equation suffers a disproportionate financial burden, it's the NPM who became a PM and signed the MSA.

Because the escrow statute itself places no burden on NPMs beyond those PMs suffer, the Revised MEA, by reducing (but not eliminating), an NPMs interest income, does not compel or "needlessly encourage" NPMs to sign the MSA and forfeit their First Amendment rights. Heightened scrutiny thus does not apply to S & M's equal protection claim.

### iii. Rational basis

■ Instead, the Court must assess whether "there is any reasonably conceivable state of facts that could provide a rational basis for the classification," in this case the Revised MEA's restrictions of NPM escrow investments. Beach Communications, 508 U.S. at 313, 113 S.Ct. 2096. "[T]hat rational-basis review," however, "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." Heller v. Doe, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). "A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification." Id. at 320, 113 S.Ct. 2637. In fact, a "legislative choice" like the Revised MEA (again, as discussed below, the Attorney General had statutory authority to promulgate the agreement)

"may be based on rational speculation unsupported by evidence or empirical data." Id.

■ As noted above, escrow statutes like Georgia's are "rationally related to a legitimate state interest: promoting public health and recovering the costs of tobacco-related illnesses." Pryor, 425 F.3d at 175. Georgia's "non-diminishment" amendment in turn is itself rationally related to those goals because it protects escrowed funds—the monetary backstop for possible future claims—from depletion. The dispute here is whether the Revised MEA is rationally related to the legitimate goal of protecting escrowed money.

It is. The State says that it helps "ensure that the escrow fund ... is not jeopardized by investment in excessively long-term securities that cannot be readily liquidated and have too much price volatility." Doc. 17–1 at 18–19; see also doc. 1–2 at 2 (letter from the Attorney General to S & M, attached to S & M's complaint, stating that the bond requirement and Revised MEA were created because of the non-diminishment amendment to Georgia's escrow statute). The State need produce no evidence supporting those reasons. Heller, 509 U.S. at 319, 113 S.Ct. 2637. So long as they amount to "rational speculation," this Court cannot second guess them. Id. In fact, so long as *any* "reasonably conceivable" reason exists, the Court must uphold the Revised MEA. Beach Communications, 508 U.S. at 313, 113 S.Ct. 2096.

Such a reason exists even if rational speculation frays the State's reason. A rational person could conclude that longer term debt poses higher risks than debt that matures faster because the chance that economic conditions degrade increases over longer periods of time. The financial solvency of a debt's guarantor, even the United States Government, thus might erode over time and raise the risk of a

default, or simply a lower return on investment.

That's true regardless of past financial trends. Put differently, what is past is not always prologue. Conditions change, economies sour, and, sometimes, governments go bankrupt. And the longer one waits, or the more times one tempts fate, the more likely any given event will occur.[4]

Rational basis created "restraints on judicial review," moreover, "have added force where the legislature must necessarily engage in a process of line-drawing." Beach Communications, 508 U.S. at 315, 113 S.Ct. 2096. In deciding what types of investments would satisfy the non-diminishment requirement, the Attorney General necessarily had to conclude that some investments fell within acceptable ranges, while others did not. This Court cannot now second guess where those lines fell. Indeed, that "necessity renders the precise coordinates of the resulting legislative judgment virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally." Id. at 316, 113 S.Ct. 2096. That the Attorney General made the relevant judgment in this case is, as discussed below, irrelevant, since the Georgia Legislature validly delegated review and approval, and rulemaking, authority to that office.

S & M has argued that the Revised MEA's real purpose is to prop up PMs by disadvantaging their competitors who haven't signed the MSA, and who thus do not funnel money to the States. Doc. 3–4 at 21. That is not irrational or even implausible, but it is not the only possibility either, much less one supported by evidence.

Georgia's escrow statute changed in April 2016, effective July 1, 2016. The Attorney General then changed the MEA in a way that rationally relates to the statutory alteration. Absent more (which S & M offers, but only in a vague, conclusory, and thus useless, form), the Court cannot presume a nefarious purpose.

S & M also insists that the State admits that its supposed rational basis for the Revised MEA (reduce illiquid long-term investments and guard against price volatility) "may not actually accomplish its asserted objective" by stating that "it is of no consequence that the Revised [MEA] may ... exclude investments that pose less risk than the permitted investments." Doc. 19 at 9 (bolding and italicization omitted). Once again, context matters. The State's "of no consequence" utterance came amid an attempt to illustrate the line drawing principle highlighted above. Viewed in that light, the "admission" is nothing more than the State wisely conceding that the wisdom of the Attorney General's line drawing might reasonably be questioned.

S & M's expert concluded that a bond portfolio that includes thirty-year Treasuries poses no greater risk than one that only contains bonds maturing after twenty years. Doc. 1–13. In fact, his analysis found that an inability to diversify "across the spectrum of U.S. Treasury bond maturities" *increased* the risk of escrowed funds investments. Id. at 1–2. S & M unsurprisingly holds those conclusions up as evidence that the Revised MEA represents an irrational restriction on its escrow deposits. Whether true or not (the State has

4. The United States' national debt illustrates well the higher risks, albeit speculative, that longer term securities pose, at least theoretically. Ten years ago, the debt stood at less than half what it is today. Wait another ten years, and it may double yet again. Wait thirty and the United States may find itself in the position Greece recently occupied–a nearly bankrupt sovereign pleading with its neighbors for financial assistance because it lacked access to debt markets. That reasoning might be highly unlikely to become reality for any number of reasons, but it certainly is not irrational.

not at this stage presented any contradictory evidence), the expert's conclusions do not reveal that the Revised MEA violates equal protection principles. At best, they show that the Attorney General drew an unwise line that deserves strong reconsideration.

The Court need not determine the wisdom of the State's decision because wisdom is not the touchstone of rational basis inquiry. Rationality is. And the Attorney General's choice to limit Treasury bond investments to twenty year maturations or less falls into that broad spectrum. Even if PMs and NPMs are similarly situated (they're not), S & M's equal protection claim therefore fails.

So too does S & M's argument that the State's justifications for the Revised MEA fall "outside the four corners of the Complaint." Doc. 21 at 8. For one, S & M commits the classic mistake of citing authority [5] and jumping immediately to a "thus we win" conclusion. See, e.g., doc. 21 at 9–10 (two pages of case citations followed by the sentence "[t]hus, because S & M Brands has sufficiently pled an equal protection claim it should be allowed to move on to the discovery stage"). But that just begs the ultimate question—did S & M state an equal protection claim (no)?

Second, and more importantly, none of the justifications (or, for that matter, the factual grounds for the Court's substantial similarity reasoning) originate outside the complaint and its attachments. The Revised MEA, Georgia's Qualifying Statute, various regulations (see, e.g., doc. 29 at 4–5 (listing many of those regulations and highlighting the complaint's allegations that underlay the State's rational basis arguments)), and documents attached to S

& M's complaint (see, e.g., doc. 1–2) provide the factual underpinnings for those rational bases. *That* is what matters on a motion to dismiss. The complaint need not also contain the very rational bases arguments the State makes in its motion to dismiss.

Yet, that is what S & M insists is lacking, and what it says justifies allowing discovery in this case. Doc. 21 at 9–10. Such a position inverts the fact/conclusion hierarchy and cannot pave the road to discovery. See Bishop v. Ross Earle & Bonan, P.A., 817 F.3d 1268, 1270 (11th Cir. 2016) (legal conclusions cannot state a claim). Regardless, PMs and NPMs like S & M are not similarly situated. No matter the procedural propriety of considering the State's rational basis arguments, then, S & M's equal protection claim fails.

### 2. Contract Impairment

Article I, Section 10, clause 1 of the United States Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts ...." That "Clause is not, however, the Draconian provision that its words might seem to imply." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 240, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). Indeed, " 'literalism in the construction of the contract clause ... would make it destructive of the public interest by depriving the State of its prerogative of self-protection.' " Id. (quoting W. B. Worthen Co. v. Thomas, 292 U.S. 426, 433, 54 S.Ct. 816, 78 L.Ed. 1344 (1934)).

For one, the Contract Clause " 'does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the pub-

---

5. Some of that authority isn't even authoritative. DeMuria v. Hawkes, 328 F.3d 704, 707 (2d Cir. 2003), which S & M cites for the proposition that general allegations of unequal treatment suffice to establish an equal protection claim, has been abrogated on the very point of law S & M relies. See Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010).

lic, though contracts previously entered into between individuals may thereby be affected.'" Id. at 241, 98 S.Ct. 2716 (quoting Manigault v. Springs, 199 U.S. 473, 480, 26 S.Ct. 127, 50 L.Ed. 274 (1905)). Put differently, "'[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject-matter.'" Id. (quoting Hudson Water Co. v. McCarter, 209 U.S. 349, 357, 28 S.Ct. 529, 52 L.Ed. 828 (1908)). Nevertheless, states' "sovereign power ... to safeguard the welfare of their citizens ... has limits when its exercise effects substantial modifications of private contracts." Id. at 244, 98 S.Ct. 2716 (citing United States Trust Co. v. New Jersey, 431 U.S. 1, 21, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)).

 "The threshold inquiry [thus] is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." Energy Reserves Grp., Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (quotes omitted).

Total destruction of contractual expectations is not necessary for a finding of substantial impairment. United States Trust Co., 431 U.S. at 26–27, 97 S.Ct. at 1519–1520. On the other hand, state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment. Id., at 31, 97 S.Ct. at 1522, citing El Paso v. Simmons, 379 U.S. 497, 515, 85 S.Ct. 577, 587, 13 L.Ed.2d 446 (1965). In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past. Allied Structural Steel Co., 438 U.S. at 242, n. 13, 98 S.Ct. at 2721, n. 13, citing Veix v. Sixth Ward Bldg. & Loan Ass'n, 310 U.S. 32, 38, 60

S.Ct. 792, 794–795, 84 L.Ed. 1061 (1940) ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic").

Id.

 If a state law substantially impairs a contractual relationship, the State "must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." Id. at 411–12, 103 S.Ct. 697 (cites omitted). "Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." Id. at 412, 103 S.Ct. 697 (alterations in original, quotes omitted). "Unless the State itself is a contracting party, [a]s is customary in reviewing economic and social regulation, ... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." Id. at 412–13, 103 S.Ct. 697 (alteration in original).

### i. Substantial impairment

 S & M argues that "[t]he degree of impairment" in this case could not be higher since the "imposition of the Revised [MEA] is ... a demand that S & M ... terminate [its] existing [escrow] contract and enter into a new one ...." Doc. 3–4 at 20; see also doc. 21 at 4–5. The State admits that the Revised MEA requires S & M "to [change] an existing contract," but insists that it does not amount to a "substantial impairment" because it does not target S & M "based on [its] status as [a] part[y] to [a] specific contract[ ]." Doc. 14 at 20; see also doc. 17–1 at 23–24. Instead, the Revised MEA "is merely the mechanism by which [a] company complies

with Georgia's [statutory] escrow requirements." Doc. 17–1 at 23. Those, notes the State, "apply to all NPMs, regardless of whether they have existing escrow agreements." Id.

S & M is correct—imposition of the Revised MEA and its investment restrictions *does* force it to modify its existing escrow agreement with SunTrust if it wants to continue selling tobacco products in Georgia. In a literal sense, then, the Revised MEA impairs S & M's current contractual right to invest in thirty-year Treasury bonds. And if literalism animated the Contract Clause, that would answer the first prong of the analysis. It doesn't though. See W.B. Worthen Co., 292 U.S. at 433, 54 S.Ct. 816 ("[L]iteralism in the construction of the contract clause ... would make it destructive of the public interest by depriving the State of its prerogative of self-protection."); Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 434–35, 54 S.Ct. 231, 78 L.Ed. 413 (1934) (state authority "to safeguard the vital interests of its people" remains no "matter that legislation appropriate to that end has the result of modifying or abrogating contracts already in effect") (quotes omitted).

Instead, impairment severity is measured in context. In Allied Structural Steel, for example, the Court invalidated a Minnesota law that retroactively modified pension compensation that private companies owed their employees pursuant to a private contract. 438 U.S. at 245, 98 S.Ct. 2716. "Not only did the state law ... retroactively modify ... compensation," observed the Court as it found a severe impairment, "it did so by changing the company's obligations in an area where the element of reliance was vital." Id.

Too, that change came to a contract that satisfied "the federal income tax code and was subject to no other legislative requirements." Allied Structural Steel, 438 U.S. at 245, 98 S.Ct. 2716. The company "thus had no reason to anticipate" the changes the law wrought. Id. at 245–46, 98 S.Ct. 2716. The company "relied heavily, and reasonably, on [its] legitimate contractual expectation" and the statute's nullification of those expectations constituted a severe impairment. Id. at 246–47, 98 S.Ct. 2716; see also Vesta Fire Ins. Corp. v. Florida, 141 F.3d 1427, 1433 (11th Cir. 1998) (state law which "prohibited the nonrenewal and cancellation of residential line insurance policies for reasons related to the risk of hurricane damage" substantially impaired insurance company's expectations by forcing it to "continue contractual relationships that otherwise ... could be rightfully terminated").[6]

In Energy Reserves Group, by contrast, a state law that prevented a natural gas producer from charging higher prices than its contract allowed for fell short of a severe impairment. 459 U.S. at 414–16, 103 S.Ct. 697. "Significant" in that case "[was] the fact that the parties [were] operating in a heavily regulated industry." Id. at 413, 103 S.Ct. 697. Indeed, "[t]he very existence" of the impaired contract clauses (which triggered pricing changes in response to state price regulation) "indicate[d] that the contracts were structured against the background of" state rules, not to mention that "the contracts expressly recognize[d] the existence of extensive regulation." Id. at 415–16, 103 S.Ct. 697. "In short," held the Court, the company's "reasonable expectations have not been impaired by the" state law. Id. at 416, 103 S.Ct. 697.

Here, imposition of the Revised MEA forces S & M to modify the permitted

6. Worth noting, the Eleventh Circuit ultimately upheld the state law in Vesta Fire, despite finding a severe impairment, because the Florida legislature's judgment in enacting the provision mandated deference. Vesta Fire, 141 F.3d at 1434.

investment provision in its escrow agreement with SunTrust Bank. The current agreement permits investment in thirty-year treasuries. Moving forward, the Revised MEA will allow only 20–year bonds, which typically pay less interest than the longer-term investments S & M favors. Consequently, says S & M, "[i]f the Revised [MEA] is imposed on S & M . . . the company will not be permitted to earn returns on its escrowed funds as high as it could receive under even the Model Escrow Agreement." Doc. 1 at 14.

Like the natural gas contracts in Energy Reserves though, S & M's current escrow agreement explicitly recognizes the MSA, attendant state regulation of NPMs, and, specifically, escrow statutes like Georgia's. Doc. 1–7 at 2. The contract even recites portions of that statute in appointing SunTrust as S & M's escrow agent. Id. (SunTrust warranting that it meets the requirements of O.C.G.A. § 10–13–2(7)). It also requires both S & M and SunTrust to send to the Attorney General certain information about escrow deposits. See, e.g., doc. 1–7 at 8. In fact, by including a clause requiring S & M to provide SunTrust a copy of Georgia's escrow statute—which changed *after* the contract's execution— the contract arguably suggests that S & M "knew its rights were subject to alteration by state . . . regulation." Energy Reserves, 459 U.S. at 416, 103 S.Ct. 697.

S & M contends that the Revised MEA upsets long-settled contractual expectations and thus amounts to a severe impairment. Doc. 21 at 5. But only *reasonable* expectations and reliance can undergird unconstitutional contract interference. See Energy Reserves, 459 U.S. at 416, 103 S.Ct. 697 ("ERG's reasonable expectations have no been impaired by the Kansas Act."). S & M, unlike the company in Allied Structural Steel whose reliance interests faced no state regulatory matrix and who thus suffered an unconstitutional impairment when the state suddenly obliterated those interests, knew from the time it executed its current escrow agreement that tobacco manufacturing and sales are heavily regulated. It knew—and, indeed, acknowledged in the escrow agreement (doc. 1–7 at 2)—that it had to comply with Georgia's escrow statute, which it knew could change (S & M lived through the enactment of Chapter 13A in 2003, for example). When it did change in April 2016 to require no diminution in the value of invested funds,[7] S & M knew (or should have known) that changes in permitted investments might be coming down the pipe.[8] Put differently, and given the Attorney General's statutory responsibility for reviewing and approving escrow agreements, and issuing rules and regulations enforcing Georgia's escrow statute, the Re-

---

7. S & M never suggests that that addition to the escrow statute itself contains constitutional shortcomings.

8. S & M points out that "the existing Escrow Agreement has been in place for a significant period of time." Doc 19 at 4. True enough. But S & M's insistence that "there have been *no new developments* or facts that would necessitate any change" to that agreement holds no water. Yes, S & M's escrow fund has successfully maintained its entire principal balance, and S & M has never failed to make an escrow payment.

As noted, however, Georgia's escrow statute itself changed. Where before it only included capital requirements for the account issuing institution, access restrictions on the tobacco manufacturer, and some investment limitations, it now makes explicit that the actual value of escrow fund investments may not decrease. See O.C.G.A. § 10–13–2(7). S & M may disagree with the Attorney General factually (*i.e.*, it believes its existing investment scheme satisfies the new requirement), but the statutory change itself constitutes a "new development[ ]" that put S & M on notice that it might be unreasonable to rely on existing expectations.

vised MEA (if not its precise contents) should not have surprised S & M.

Any impact it has on S & M's reasonable reliance interests is, in any event, muted by the agreement's "grandfather clause." That provision allows S & M's current investments to remain in thirty-year bonds. Only new investments are subject to the Revised MEA's restrictions. See doc. 1–3 at 44 ("If the Company has pre-existing investments that are not Permitted Investments under this Escrow Agreement, but were permitted under the prior escrow agreement, the Company may continue to own these specific investments until they mature or are sold by the Company.").[9]

Unlike the Minnesota law in Allied Structural Steel, then, the Revised MEA does not apply retroactively. 438 U.S. at 246, 98 S.Ct. 2716; see also W.B. Worthen Co. v. Thomas, 292 U.S. 426, 431–32, 54 S.Ct. 816, 78 L.Ed. 1344 (1934) (state exemption of life insurance policy proceeds from creditor liens, "applied in the case of debts owing before the exemption was created by the Legislature, constitutes an unwarrantable interference with the obligation of contracts in violation of the constitutional provision"). In other words, it does not upset investments S & M made in reliance on its existing escrow contract; rather, it alters only future expectations and investment strategies.[10]

As noted, the Revised MEA forces Sun-Trust and S & M to change one paragraph of their existing agreement. But again, mere effect is not the touchstone of an impairment analysis. See Allied Structural Steel, 438 U.S. at 241, 98 S.Ct. 2716 (the Contract Clause " 'does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected' ").[11] It only applies prospectively (it upends no existing investments), and serves as but one piece of a complex regulatory web within which S & M must operate. "In short, [S & M's] reasonable expectations," which it "structured against the background of . . . extensive [state] regulation," "have not been impaired by the [Revised MEA]." Energy Reserves, 459 U.S. at 416, 103 S.Ct. 697.[12]

---

**9.** The Court acknowledges that S & M oftentimes liquidates investments before they mature. If the State forces it to sign the Revised MEA, continuing that investment strategy will mean that the cash from any sales of grandfathered bonds could only be invested in shorter maturity instruments. Even so, that does not change the effect the Revised MEA has on S & M's reliance interests. It remains the case that the Revised MEA only impacts S & M's investments and investment strategy moving forward.

**10.** The same can be said of many laws that withstand constitutional scrutiny. Indeed, the State would face no Contracts Clause obstacle (though its citizenry might protest) in passing a law that bans tobacco sales completely. That, *far* more than the Revised MEA, would likely upset S & M's contractual expectations with a whole host of entities, not just its escrow account provider.

**11.** Although it did not have to rewrite a contract provision as the Revised MEA requires of S & M, Allied Structural Steel in a very real sense suffered more. The Minnesota law it objected to fundamentally changed its pension payment system and retroactively forced it to pay money to previously excluded retirees. The Revised MEA, by contrast, alters nothing about an escrow agreement's superstructure or how much S & M must pay into escrow.

**12.** The law challenged in Energy Reserves, but not the one at issue in Allied Structural Steel, contained a "sunset" provision limiting the amount of time it was in effect. No such limitation attaches to the Revised MEA. Although the temporary or emergency nature of state's law bolsters its constitutionality, see Allied Structural Steel, 438 U.S. at 250, 98 S.Ct. 2716, that is just one possible fact that can influence a Contract Clause analysis. See

Because none of its interests suffer in constitutionally significant ways, S & M's Contracts Clause claim fails.

### ii. State interest in impairment

█ "To the extent, if any, the [Revised MEA] impairs [S & M's] contractual interests, the [Revised MEA] rests on, and its prompted by, significant and legitimate state interests." Energy Reserves, 459 U.S. at 416, 103 S.Ct. 697. Recall that the MSA arose from lawsuits over the healthcare costs tobacco products imposed on state healthcare budgets. Doc. 1 at 4. By extension (one explicitly recognized), those same healthcare concerns also animate state escrow statutes like Georgia's (including its new "non-diminishment" provisions), and, by further extension, the Attorney General's attempts to implement and promote compliance with that statute. See O.C.G.A. § 10–13–1. And protecting citizen health (in this case by ensuring a source of recovery for future tobacco-related health claims) lies at the core of a state's legitimate police power. It thus qualifies as a "significant and legitimate state interest." See KT & G Corp v. Att'y Gen. of State of Okla., 535 F.3d 1114, 1140 (10th Cir. 2008); Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 175 (2d Cir. 2005) (equal protection and substantive due process claims found "unavailing because the Escrow Statutes are rationally related to a legitimate state interest: promoting public health and recovering the costs of tobacco-related illnesses"); Star Scientific, Inc. v. Beales, 278 F.3d 339, 352 (4th Cir. 2002) (same).

S & M contends that the Revised MEA's investment restrictions aim to protect PMs from NPM market share encroachment, not undergird the state's interest in healthcare. See doc. 3–4 at 21. Indeed, says S & M, the "serious public health

concerns related to smoking have already been remedied by the Georgia General Assembly with the enactment of Title 10, Chapters 13 and 13A of the Georgia Code." Id. at 20 (quotes omitted). Because the Revised MEA "goes beyond the codified requirements" in those chapters, it "does nothing to alleviate any broad and general social or economic problem." Id. (quotes omitted).

Certainly the MSA acknowledges that qualifying escrow statutes are those that "effectively and fully neutralize[ ] the cost disadvantages that the [PMs] experience . . . as a result of [its] provisions." Doc. 1–1 at 58–60. Considered alone, that suggests the purpose of Georgia's statute, and thus the Revised MEA, is to buck up PMs, not provide for public health. As per usual, however, context is king.

Reducing NPM cost advantages vis-a-vis PMs serves a larger purpose. It helps ensure that PMs continue to compete on a level playing field, which in turn safeguards their ability to make MSA payments. *That* protects public health, which, as discussed above, is undeniably a "broad and general social" issue which the State's police power may legitimately address.

Whether the Revised MEA goes beyond Georgia's "codified requirements," as S & M suggests (doc. 3–4 at 20), and even if it serves to protect PMs, it nevertheless remains aimed at preserving PM viability and thus their MSA payments to the State. Those benefit public health—as does the mere presence of a guaranteed fund to pay for any future claims against NPMs like S & M—and the Revised MEA's support for them thus serves a "legitimate public purpose." Energy Reserves Group, 459 U.S. at 412, 103 S.Ct. 697.

id. at 242, 98 S.Ct. 2716. Even where, as here, a law effects a permanent change to certain contracts, it may still fall short of a substan-

tial impairment if it lightly impacts a contracting party's reasonable expectations. Energy Reserves, 459 U.S. at 411, 103 S.Ct. 697.

Still, the mechanism (the Revised MEA) by which that purpose is served must be of an appropriate character and based "upon reasonable conditions." Id. In evaluating that requirement, the Court must "properly defer to legislative judgment as to ... reasonableness,"[13] since Georgia is not a party to the escrow agreement allegedly impaired. Id. at 413, 103 S.Ct. 697.

The Georgia Legislature has determined that NPMs should be required to escrow certain funds. O.C.G.A. § 10–13–1. Why? In order to neutralize NPM cost advantages over PMs, which NPMs might use to "derive large, short-term profits in the years before [their tobacco illness-related] liability may arise." Id. at (f). By the legislature's measure, an escrow system will best "guarantee a source of compensation" and "prevent [NPMs] from deriving" those profits "and then becoming judgment-proof before liability may arise." Id. The Attorney General in turn is tasked with reviewing and approving escrow agreements to ensure they satisfy statutory mandates, including that escrowed funds'

principal balance never diminishes as a result of soured investments. O.C.G.A. § 10–13A–3(d). He also may promulgate rules and regulations to implement the escrow statute, including its "non-diminishment" requirements. O.C.G.A. § 10–13A–10(c). Exercising the discretion inherent in those legislative instructions, the Attorney General has decided that the Revised MEA best enables him to ensure that NPM escrow agreements satisfy that "non-diminishment" principle.

S & M offers no viable reason to discount that logical progression,[14] particularly in light of the deference owed legislative findings and the decision to delegate review and rulemaking authority to the Attorney General. Hence, the State rationally imposed the Revised MEA on NPMs like S & M in order to remedy the very real social problem of tobacco-related illnesses and the healthcare costs they create. Substantial impairment of S & M's existing escrow agreement or not, the Revised MEA does not violate the Constitution's Contract Clause.

13. As discussed more fully below, because the Attorney General's promulgation of the Revised MEA is not an *ultra vires* act (*i.e.*, he possesses statutory authority to require adherence), the Court owes deference to the Georgia Legislature's judgment as embodied in the relevant statutory scheme.

14. S & M, in its equal protection arguments, contends that the Revised MEA's investment restrictions have "no legitimate purpose" because they provide no greater "non-diminishment" protection than existing limitations. Maybe that's factually accurate. Even so, it's not factually obvious (a rational observer could easily conclude that longer-term investments pose higher risk simply by virtue of their extended lifespan).

Nor is that the only reason the State gives for promulgating the Revised MEA. Its restrictions also "help ensure that the escrow fund ... is not jeopardized by investment in

excessively long-term securities that ... have too much price volatility." Doc. 14 at 16. Even S & M's expert, whose report S & M attached to its complaint, admits that longer maturation bonds fluctuate in price more than shorter term investments (though he counters that diversification neutralizes that volatility). See doc. 1–13. Regardless, the state need not provide *any* reason; there need only exist a reasonably conceivable state of facts that justify a given state action. Hence, the Revised MEA rests comfortably within the broad range of means available to the State to achieve its desired ends and thus cannot be overturned. See KT & G, 535 F.3d at 1138 ("[W]e will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish, or because the statute's classifications lack razor-sharp precision. Nor can we overturn a statute on the basis that no empirical evidence supports the assumptions underlying the legislative choice.").

#### 3. *Ultra Vires*

 S & M contends that the "Attorney General's imposition of the Revised Model Escrow Agreement is an act beyond his enumerated, powers and is therefore invalid." Doc. 3–4 at 8; see also doc. 21 at 11. Because he may only "review and approve an NPM's escrow agreement," says S & M, imposing "additional requirements on the investments of an NPM's escrowed funds" amounts to an *ultra vires* act. Doc. 3–4 at 8.

 Government "action contrary to . . . statute which" a governmental entity has "no power to take" is *ultra vires* (beyond one's legal authority) and void. City of Holly Springs v. Cherokee Cty., 299 Ga.App. 451, 457, 682 S.E.2d 644 (2009) (quoting Quillian v. Employees' Retirement Sys. of Ga., 259 Ga. 253, 255, 379 S.E.2d 515 (1989)). But there is a "broad distinction . . . between an irregular exercise of a granted power, and the total absence or want of power." Id. Only in the latter circumstance does an action qualify as *ultra vires* under Georgia law.

In City of Smyrna v. Adams, Smyrna "purported to annex two parcels of land." 255 Ga. App. 453, 453, 565 S.E.2d 606 (2002). That annexation's propriety turned on whether the city properly annexed South Cobb Drive on or before January 1, 1991. Id. The city asserted that annexation of the road occurred in 1985, while Adams claimed that it happened in April 1991, too late for the land annexation to be effective. Id. The court then examined annexation law from 1985 and found that Smyrna could have legally annexed the road in three ways. Id. at 454, 565 S.E.2d 606. Because its purported annexation did not follow any of the three available methods, it amounted to an *ultra vires* act that could

not undergird the later land annexation. Id.

Promulgating the Revised MEA, by contrast, did not exceed the Attorney General's authority under the escrow statute. Georgia law requires him to, among other things, "perform such other services as shall be required of him by law." O.C.G.A. § 45–15–3(7). The escrow statute in turn requires some of those "other services." Id. For example, "[t]o promote compliance" with that statute, including with O.C.G.A. § 10–13A–2(14)'s "non-diminishment" requirement, the Attorney General may promulgate regulations. O.C.G.A. § 10–13A–8(f); see also O.C.G.A. § 10–13A–10(c) ("The Attorney General may promulgate rules and regulations necessary to effect the purposes of this chapter."). He also is empowered to review and approve proposed qualified escrow agreements. O.C.G.A. § 10–13A–3(d)(2).

The Revised MEA represents nothing more than the Attorney General "promulgat[ing]" a rule "to effect the purposes" of the escrow statute. O.C.G.A. § 10–13A–10(c); O.C.G.A. § 50–13–2(6) (" 'Rule' means each agency regulation, standard, or statement of general applicability that implements, interprets, or prescribes law or policy or describes the organization, procedure, or practice requirements of any agency.").[15] Specifically, the Revised MEA serves to "effect" O.C.G.A. § 10–13A–2(14)'s "non-diminishment" requirement. Whether the Revised MEA's investment restrictions in fact enhance the stability of an escrow fund's principal balance, they do target that goal. Doing so removes them from the *ultra vires* realm since (1) "non-diminishment" is a statutorily prescribed requirement for qualified escrow funds,

---

**15.** The Attorney General, as head of the Georgia Department of Law, constitutes an "agency" for purposes of the Georgia Administrative Procedures Act. O.C.G.A. § 50–13–2(1) (" 'Agency' means each state . . . department . . . or officer authorized by law expressly to make rules and regulations . . . .").

and (2) the Attorney General has authority to enact rules to promote compliance with such mandates.

The Revised MEA may also qualify as nothing more than an exercise of the Attorney General's authority to review and approve escrow agreements. To review something is to "to go over or examine [it] critically or deliberately." [16] And to approve it is to "give formal or official sanction." [17] When combined, review and approval authority suggest that the Attorney General can effectively dictate the terms of escrow agreements, so long as they further the escrow statute's aims. He can critically examine a proposed investment limitation, for example, and, after considering the escrow statute's non-diminishment mandate, decide to withhold his official sanction. That's nothing more than the inverse of telling a tobacco product manufacturer that only certain investments will receive official approval. Much like the Commerce Clause of the Constitution contains a dormant or negative counterpart,[18] review-and-approve authority likewise contains an implicit power to delineate the agreement terms that will receive official sanction. At worst, use of the review authority to dictate terms represents an "irregular exercise of a granted power." City of Holly Springs, 299 Ga.App. at 457, 682 S.E.2d 644; see also id. ("[T]he city's failure to finalize the annexation by adopting the ordinance, preparing a survey, and filing it with the Secretary of State was a mistake or error of omission. It was not an action contrary to the statute which the city had no power to take, but 'simply making a mistake during an otherwise authorized action under the' statute.").

Adams underscores that conclusion. There, the city had three starkly defined avenues by which it could annex land. It did not follow any of them. The actions it later characterized as annexation thus were *ultra vires*. Here, however, the Attorney General had broad authority to issue rules he saw as necessary to effect the purposes of the escrow statute and promote compliance with its provisions, which include the "non-diminishment" requirement.

Taken to its logical extreme, S & M's position would neuter Georgia executive agencies' authority to promulgate rules and regulations. An illustrative example: Statute A regulates power plant emissions. It bans the burning of fossil fuels, mandates that power producers maintain energy production at current levels, and gives power to the Georgia Public Service Commission to issue rules to effect its purposes.

Applying S & M's arguments to that hypothetical, a PSC rule that required solar power to account for at least 25% of a producers output would qualify as *ultra vires* simply because the original statute said nothing about solar power or otherwise limited a producer's power generation portfolio beyond the fossil fuel ban. In more general terms, S & M's position says rulemaking qualifies as *ultra vires* when

16. "Review." Merriam–Webster Online Dictionary. https://www.merriam-webster.com/dictionary/review (January 18, 2017).

17. "Approve" Merriam–Webster Online Dictionary. https://www.merriam-webster.com/dictionary/approve (January 18, 2017).

18. See Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 337, 128 S.Ct. 1801, 170 L.Ed.2d 685 (2008) ("The Commerce Clause empowers Congress '[t]o regulate Commerce ... among the several States,' Art. I, § 8, cl. 3, and although its terms do not expressly restrain "the several States" in any way, we have sensed a negative implication in the provision since the early days") (alterations in original).

that authority is paired with ambiguous statutory text.

That, however, is the very essence of rulemaking. A legislative body expresses a broad principle. It then taps an executive entity to flesh out the specifics. States and the federal government use that model daily (much to the chagrin of those who believe in stark separation of powers). And that's what Georgia did with its escrow statute. Nothing about that mechanism renders the Revised MEA's issuance *ultra vires.*

Maybe the Attorney General did not follow proper procedures in issuing the rule. Maybe the rule is ill-advised. Maybe it's not a rule at all. But whatever else may be said about the Revised MEA, it cannot be said that it came about in the "total absence or want of power." City of Holly Springs, 299 Ga.App. at 457, 682 S.E.2d 644. S & M's *ultra vires* claim thus fails.[19]

## B. Equal Protection—Escrow Rules

■■■ S & M's fourth claim asserts that "the regulatory provisions imposed on NPMs, but not PMs, result in a violation of equal protection." Doc. 1 at 30. PMs, contends S & M, avoid for "no rational [reason]" quarterly escrow deposits, appointing and maintaining an agent for service of process, posting a bond, and the threat of decertification to sell in Georgia if escrow deposits are not paid. Id. at 31. In fact, "the Attorney General has an equal inter-

est" in guarantying PM and NPM deposits on a quarterly basis; guarantying payment via a bond; removing both from the approved manufacturer directory if they fail to pay; and serving process on both NPMs and PMs. Id. at 31–32. Yet, the State, S & M notes, shackles only NPMs. Id. at 30. Because doing so furthers no compelling or legitimate state interest, the regulations, in S & M's view, violate the Equal Protection Clause. Id. at 32.

For the same reasons the Revised MEA Equal Protection claim fails, so too does S & M's regulation-based cause of action. Most importantly, PMs and NPMs, for the reasons outlined above, are not similarly situated (that alone kiboshes the claim). Were that not enough, the State has ample reason to require a bond, quarterly deposits, maintenance of an agent for service, and to threaten directory removal for non-payment of escrow deposits. PMs deposit money that belongs to the state. NPM deposits remain their property unless claims crop up. That ownership difference alone justifies a bond requirement, for example. But other PM and NPM differences, namely those surrounding a given manufacturer's relationship to the MSA and "their status *vel non* as defendants," [20] justify different regulatory treatment, too.

PMs have contractual obligations to the State because they signed the MSA. NPMs like S & M do not. That provides the State extra protections—*i.e.*, it bears

---

19. Because the Court finds that the Attorney General had statutory authority to promulgate the Revised MEA, it need not address the State's argument that sovereign immunity bars injunctive relief (doc. 17–1 at 11–12), an issue that the Georgia Supreme Court may not have yet decided. Compare State v. Int'l Keystone Knights of the Ku Klux Klan, Inc., 299 Ga. 392, 396 n. 11, 788 S.E.2d 455 (2016) ("[W]e have not had occasion to consider the extent to which the doctrine of sovereign immunity bars claims for injunctive or declaratory relief from state action that is alleged to

be unconstitutional.") (citing Olvera v. Univ. System of Ga. Bd. of Regents, 298 Ga. 425, 428, n. 3, 782 S.E.2d 436 (2016)), with Ga. Dep't of Nat. Resources v. Center for a Sustainable Coast, Inc., 294 Ga. 593, 755 S.E.2d 184, (2014) (sovereign immunity barred injunction against state agency that would have prohibited it from sending "letters of permission" to land developers, where plaintiff argued that such letters violated Georgia law).

20. KT & G Corp. v. Att'y Gen. of State of Okla., 535 F.3d 1114, 1140 (10th Cir. 2008).

less risk of PM non-payment, timely payment, etc.—that it lacks with NPMs. And those justify quarterly payments for NPMs while allowing PMs to pay once a year, as well as directory removal (contractual remedies replace the threat of removal as the State's leverage over PMs), and the registered agent requirement (PMs, but not NPMs, have consented to the jurisdiction of Georgia courts). But again, the dissimilarities between NPMs and PMs doom S & M's regulatory equal protection claim in any event, rational basis for the differential treatment or not. See Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1207 (11th Cir. 2007).

### C. Escrow Overpayments

■ In its final two claims, S & M contends that the State has refused to authorize the return of funds it placed in escrow in excess of the amount required by law. See doc. 1 at 34. Those actions, says S & M "coerce" it "into relinquishing [its] constitutionally protected First Amendment rights," in addition to violating O.C.G.A. § 10–13–3(2)(B)(ii).[21] Id.

The State believes that sovereign immunity shields it from those claims. Doc. 17–1 at 12. Conclusory allegations of constitutional violations cannot, says the State, hurdle that bar to suit because the "substance" of S & M's claim is a violation of a state statute, not the U.S. Constitution. Id. at 12–13. What's more, says the State, the claims are not ripe because the Attorney General "has not yet issued any such refusal" to pay. Id. at 13. There thus is no state decision for this Court to review. Id. at 14.

Ripe or green, S & M's refund claims falter at the feet of the State's immunity. Absent a state's consent, "a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Alabama v. PCI Gaming Auth., 801 F.3d 1278, 1290 (11th Cir. 2015) ("State officials are immune from suit in federal court for claims arising under state law because 'it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.'") (quoting Pennhurst, 465 U.S. at 106, 104 S.Ct. 900). In determining whether a particular claim arises under state law, courts must look to the substance of the claim. See DeKalb Cty. Sch. Dist. v. Schrenko, 109 F.3d 680, 688 (11th Cir. 1997) (district court concluded that state defendant violated state statute, that plaintiff was due money pursuant to state law, and measured damages via another state statute; that revealed the "substance" of the court's judgment "to be one for violation of state law ... barred by the Eleventh Amendment").

S & M's claim that the State has violated O.C.G.A. § 10–13–3(2)(B)(ii) is the definition of a state law claim against a state official. Sovereign immunity bars it regardless of how S & M's claim that the same conduct infringes constitutional rights shakes out. See Schrenko, 109 F.3d at 688 ("[A] federal court may not entertain a cause of action against a state for alleged violations of state law, even if that

---

**21.** S & M also claims that the State's withholdings violate "Article I, Section 12 of the Georgia Constitution." Doc. 1 at 34. That provision protects access to courts, not free speech. The Court presumes S & M intended to cite Article I, Section I, paragraph V, which discusses free speech, but the citation disparity makes that something less than a sure bet. Regardless, the retention of escrow funds violates neither free speech nor access to courts.

state claim is pendent to a federal claim which the district court could adjudicate.").

Immunity bars S & M's free speech refund claim as well because that count is, in substance, just a retread of the § 10–13–3(2)(B)(ii) claim. As discussed above, nothing about Georgia's escrow requirements compels NPMs to sign the MSA and relinquish their First Amendment rights. Most importantly, NPMs retain ownership of their escrow deposits and continue earning interest on them, whereas PMs pay the State and never get that money back (except under narrow exceptions irrelevant here). A refusal to return overpayments, though it arguably violates state law, does not change that calculus. Even if it somehow did, S & M makes the fatal mistake of never alleging facts pointing to how. Instead, it concludes that "Defendant's refusal to authorize the refunds ... coerce[s] S & M ... into relinquishing [its] protected First Amendment rights." Doc. 1 at 34. But legal conclusions do not state claims. S & M's First Amendment refund claim, like all its others, thus fails.

### III. CONCLUSION

Accordingly, Georgia's motion to dismiss is **GRANTED**. Doc. 17. The Clerk is **DIRECTED** to close this case.

**SO ORDERED,** this 30th day of May 2017.