**XCALIBER INTERNATIONAL, LTD. LLC, Plaintiff,**

**v.**

**State of GEORGIA EX REL. Christopher M. CARR, Attorney General, Defendant.**

**CIVIL ACTION NO. 1:16–CV–3665–SCJ**

United States District Court, N.D. Georgia, Atlanta Division.

Signed May 30, 2017

Filed 05/31/2017

1222

Bryan Michael Haynes, Troutman Sanders, LLP, Richmond, VA, Seth T. Ford, John Sikes Gibbs, III, Troutman Sanders, LLP, Atlanta, GA, for Plaintiff.

Robin Ginsburg Cohen, State of Georgia Law Department, Atlanta, GA, for Defendant.

## ORDER

HONORABLE STEVE C. JONES, UNITED STATES DISTRICT JUDGE

Before the Court in this 42 U.S.C. § 1983 case is the State of Georgia's motion to dismiss Xcaliber International, Ltd. LLC's complaint. Doc. 14.[1] Xcaliber, a tobacco product manufacturer, asserts that pieces of Georgia's tobacco regulatory regime violate the Constitution's Contracts and Equal Protection Clauses, as well as state law. Georgia insists that those causes of action all fail, either because the Court lacks subject matter jurisdiction, or because they do not state claims. Because the State is correct on both scores, its motion is **GRANTED** and Xcaliber's complaint **DISMISSED**.

## I. BACKGROUND [2]

In 1998, 52 jurisdictions, including Georgia, entered into a Master Settlement Agreement (MSA) with large tobacco manufacturers to resolve lawsuits brought to recover smoking-related health care costs. Doc. 1 at 4. Manufacturers that signed the MSA are "participating manufacturers" (PMs), while those, like Xcaliber, who did not are "non-participating manufacturers"

(NPMs). Id. at 5. PMs agreed to make settlement payments to settling states in perpetuity (id.) and limit their "advertising, sponsorship, lobbying, and litigation activities," among other restrictions. KT&G Corp v. Att'y Gen. of State of Okla., 535 F.3d 1114, 1119 (10th Cir. 2008); Doc. 1 at 5–6. NPMs, on the other hand, make no settlement payments and suffer no limitations on their First Amendment activities.

The MSA contains a number of provisions designed to counterbalance the competitive disadvantages it imposed on PMs[3] and "protect the public health gains [it] achieved." Doc. 1–1 at 55. One, the "NPM Adjustment," reduces settlement payments by PMs if they experience market share loss "as a result of the provisions of" the MSA. Id. at 56. PMs "shall not be subject to an NPM Adjustment" in a given settling state, however, if the state enacts and diligently enforces a "Qualifying Statute." Id. at 58–59. The MSA, in turn, defines that as a statute "that effectively and fully neutralizes the cost disadvantages that the [PMs] experience vis-a-vis [NPMs] ... as a result of the provisions of" the MSA. Id. at 58–60. The MSA stipulates that its Model Escrow Statute, "if enacted without modification or addition ... shall constitute a Qualifying Statute." Id. at 60.

### A. Georgia's Qualifying Statute

Georgia enacted that Model Escrow Statute after finding that "[c]igarette smoking presents serious public health

---

**1.** All citations are to the electronic docket, and all page numbers are those imprinted by the Court's docketing software.

**2.** A little more than four months ago, the Court denied another tobacco company's motion for preliminary injunction in a case raising almost identical claims to those asserted here. See S & M Brands, Inc. v. Georgia ex rel. Carr, 230 F.Supp.3d 1338, 1341–42, 2017 WL 227858, at *1 (N.D. Ga. Jan. 19, 2017).

Rather than reinvent the wheel, and because of its direct applicability, this Order liberally cribs from the Court's previous work.

**3.** The settlement payments PMs make forced them to raise prices on their tobacco products. Had the MSA not compensated for that, NPMs could maintain their profit margins at a lower price point than PMs. Hence, the competitive disadvantage PMs would face because of the decision to settle.

concerns" that create "serious financial concerns for the state" which are best "borne by tobacco product manufacturers." See O.C.G.A. §§ 10–13–1(a)-(d). The legistlature also concluded that "[i]t would be contrary to the policy of the state if tobacco product manufacturers who determine not to enter into such a settlement could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the state will have an eventual source of recovery from them if they are proven to have acted culpably." O.C.G.A. § 10–13–1(f). Under Georgia's Qualifying Statute, then, NPMs can either sign the MSA and become a PM, or remain an NPM and deposit money (approximately $0.02 per cigarette sold) into a "qualified escrow fund." O.C.G.A. § 10–13–3.

> A "qualified escrow fund" is
>
> an escrow arrangement with a federally or state chartered financial institution having no affiliation with any tobacco product manufacturer and having assets of at least $1 billion where such arrangement requires that such financial institution hold the escrowed funds' principal for the benefit of releasing parties and prohibits the tobacco product manufacturer placing the funds into escrow from using, accessing, or directing the use of the funds' principal except as consistent with subparagraph (B) of paragraph (2) of Code Section 10–13–3. *The principal balance in the qualified escrow fund must always be maintained so that both the face value and the cost basis of the account are each equal to or greater than the accumulated principal deposits.*

O.C.G.A. § 10–13–2(7) (emphasis added); see also O.C.G.A. § 10–13A–2(14) (same). NPMs "shall receive the interest and other appreciation on such funds," but the "funds themselves shall be released from escrow only": (1) to pay a judgment or settlement of a claim that the MSA released if asserted against a PM; (2) if the amount placed in escrow exceeded the amount a PM would have paid under the MSA (only the excess amount is released); or (3) after 25 years. O.C.G.A. § 10–13–3(B).

NPMs must make quarterly escrow deposits, while PMs pay annually. Doc. 1 at 16; O.C.G.A. § 10–13–3(2)(A). NPMs also must appoint and maintain a registered agent for service of process, while PMs need not. Doc. 1 at 17; O.C.G.A. § 10–13A–3(d)(1). Finally, NPMs, but not PMs, must post a bond—which the State may execute if the NPM misses an escrow deposit—the amount of which "shall be the greater of: (1) Fifty thousand dollars; or (2) The highest amount of escrow owed in Georgia by the nonparticipating manufacturer or its predecessor in the last 12 quarters." O.C.G.A. § 10–13A–7(b).

### B. Georgia's Model Escrow Agreement

Georgia's Attorney General plays an integral role in administering and enforcing the escrow statute. He maintains a directory of approved tobacco manufacturers (O.C.G.A. § 10–13A–4), receives annual compliance certifications from those manufacturers (O.C.G.A. § 10–13A–3), and reviews and approves all proposed escrow agreements. Id. at (d). He also has authority to promulgate rules and regulations necessary to implement the escrow statute. O.C.G.A. § 10–13A–8(f); see also O.C.G.A. § 10–13A–10(c) ("The Attorney General may promulgate rules and regulations necessary to effect the purposes of this chapter.").

To "facilitate compliance" with "qualified escrow fund" requirements, and pursuant to his review authority, the Attorney General promulgated a Model Escrow Agreement "for use by NPMs and their escrow

agents." Doc. 14–1 at 6 (citing doc. 1 at 9). Among other things, that agreement "restricts the types of investments that may be included in an NPM's escrow account." Id. The State concedes that "[t]he AG will not approve an escrow agreement unless it limits the investments in an NPM's escrow account consistently with the model escrow agreement." Id.

From 1998 until recently, the model agreement provided that:

> The escrow agent shall invest and reinvest all amounts from time to time credited to the Accounts in (a) the Escrow Agent's U.S. Treasury money market fund; (b) direct obligations of, or obligations the principal and interest on which are unconditionally guaranteed by, the United States of America; (c) repurchase agreements fully collateralized by securities described in clause (b) above; (d) money market accounts maturing within 30 days of the acquisition thereof and issued by a bank or trust company organized under the laws of the United States of America or any of the 50 states thereof (a "United States Bank") and having combined capital, surplus and undistributed profits in excess of $500,000,000; (e) demand deposits with any United States Bank having combined capital, surplus and undistributed profits in excess of $500,000,000.

Doc. 1–5 at 7. Those investment terms "are modeled on and nearly identical to the investment terms negotiated by the Settling States and the PMs for the investment of MSA funds." Doc. 1 at 12.

In compliance with those terms, Xcaliber's current investment mix includes Ginnie Mae bonds that "consist of home mortgages bought by the Government National Mortgage Association" (Ginnie Mae). Doc. 1 at 13. "Both the principal and interest of the Ginnie Mae bonds . . . are guaranteed by the full faith and credit of the United States. Id. at 13–14. "Traditionally," those

bonds "offer a higher return to investors than Treasury Securities" while containing less volatility. Id. at 14.

In August 2016, however, the Georgia Legislature began to require that an escrow fund's "principal balance" never diminish to the "qualified escrow fund" definition. O.G.G.A. § 10–13–2(7). In response, the Attorney General changed the Model Escrow Agreement. Now, "permitted investments" are "limited to the following: (a) United States Treasury Securities, (b) cash, or (c) Money Market Fund." Doc. 1–8 at 4. "United States Treasury Securities" in turn means "bills, notes, and bonds issued by the United States Treasury (i) maturing no more than (20) twenty years from the date of purchase . . . ." Id. at 5. Investment vehicles for MSA funds escrowed by PMs have not been similarly limited. Doc. 1 at 13.

## C. Xcaliber's Complaint

On August 2, 2016, the Attorney General notified Xcaliber and other NPMs that they had to submit new escrow agreements that mirrored the Revised MEA no later than September 1, 2016. Doc. 1–2. The parties attempted to negotiate modifications to the Revised MEA, but could not come to an agreement. Xcaliber filed its complaint on September 29, 2016 (doc. 1), the day before the Attorney General's September 30, 2017 deadline for deciding whether to remove Xcaliber from the State's list of approved tobacco product manufacturers. See doc. 1–3 at 2–3.

In it, Xcaliber asserts five claims. It first contends that imposition of the Revised MEA, by forcing Xcaliber to terminate its existing escrow agreement, amounts to an unconstitutional impairment of contract. Doc. 1 at 21–23. Because the Revised MEA more severely restricts NPM escrow investments than the MSA limits PM escrow investments, it also, says Xcaliber, violates

the Equal Protection Clause. Id. at 23–24. Regardless of the Revised MEA's constitutional infirmities, Xcaliber insists that the Attorney General simply lacks legal authority to "draft and dictate" that agreement. Id. at 25. His doing so thus amounts to a void *ultra vires* action. Id.

In its remaining claims, Xcaliber asserts that (1) the agent appointment, bond, quarterly deposit, and delisting provisions of the escrow statute applicable to NPMs, but not PMs, violate the Equal Protection Clause, and (2) the State's § 1983 violations warrant attorney's fees under 42 U.S.C. § 1988. Doc. 1 at 26–29.

## II. STANDARD OF REVIEW

The State seeks dismissal of the complaint under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). See doc. 14–1 at 9. To survive the latter, and comply with Federal Rule of Civil Procedure 8(a)(2), complaints must contain "only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In deciding whether claims comply, courts must "accept[ ] the [factual] allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." Boyd v. Warden, Ala. Dep't of Corrections, 856 F.3d 853, 864, 2017 WL 1856071, at *5 (11th Cir. May 9, 2017). Conclusory allegations, however, are not entitled to that assumption of truth—they "must be supported by factual allegations." Bishop v. Ross Earle & Bonan, P.A., 817 F.3d 1268, 1270 (11th Cir. 2016).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127

S.Ct. 1955. To avoid dismissal, "a complaint," in other words, "must 'state a claim to relief that is plausible on its face,' meaning it must contain 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Bishop 817 F.3d at 1270 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

> Rule 12(b)(1) motions[, by contrast,] come in two flavors. They "can be asserted on either facial or factual grounds." Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1279 (11th Cir. 2009). Facial attacks on subject matter jurisdiction are subject to the same standard of review as 12(b)(6) motions. Gupta v. McGahey, [709 F.3d 1062, 1064 (11th Cir. 2013) ] (citing Carmichael, 572 F.3d at 1279). Attacks on the factual underpinnings of jurisdiction, on the other hand, may allow a court to "consider extrinsic evidence such as deposition testimony and affidavits." Carmichael, 572 F.3d at 1279. And with factual attacks, "the burden is on the plaintiff to prove that jurisdiction exists." Gibbs v. United States, 865 F.Supp.2d 1127, 1135 (M.D. Fla. 2012) (quoting OSI, Inc. v. United States, 285 F.3d 947, 951 (11th Cir. 2002)).

Roberts v. Wells Fargo Bank, N.A., No. 4: 12–CV–200, 2013 WL 1233268, at *4 (S.D. Ga. Mar. 27, 2013).

## III. ANALYSIS

The State divides Xcaliber's claims into two buckets: one for assaults on the Revised MEA, and a second for an Equal Protection claim against four other escrow-related laws and administrative rules. The first rests on 12(b)(6) justifications, while this Court, says the State, lacks subject matter jurisdiction over Xcaliber's *ultra vires* claim.

## A. Constitutional Claims—the Revised MEA

The State insists that Xcaliber's Contracts and Equal Protection Clause attacks against the Revised MEA fail to state claims. Doc. 14–1 at 10–11. Equal protection affords Xcaliber no succor, says the State, because PMs and NPMs are not similarly situated, and because the revision's purposes—ensuring a source of recovery for the state, and facilitating the Attorney General's review of escrow agreements—provides a rational basis for the regulatory shift. See id. at 11. The State believes that the Revised MEA survives Contracts Clause scrutiny because it imposes no substantial impairment on Xcaliber's escrow agreement, and is justified even if impairment exists. Id. at 22; see also doc. 19 at 2.

Xcaliber, on the other hand, contends that it and other NPMs are "similarly situated to PMs because ... (1) both groups operate in the same industry in Georgia; (2) both groups have similar financial obligations to the State in perpetuity; and (3) both groups are subject to the enforcement mechanisms of Defendants with respect to their escrow obligations." Doc. 16 at 10. Yet, only NPMs suffer the Revised MEA's investment restrictions. Id. PMs remain unaffected. Id. That "differential treatment" lacks a rational justification, says Xcaliber, and thus suffices to state the second element of an Equal Protection claim. Id.

What's more, Xcaliber notes, the State "relies very heavily on facts beyond the four corners of the Complaint" and thus outside the Court's 12(b)(6) reach. Doc. 16 at 11. At best, the facts the State relies upon do nothing more than create a factual dispute with Xcaliber's expert. Id. at 12. All the more reason to deny dismissal, says Xcaliber. Id.

Xcaliber also believes that the Revised MEA triggers heightened, not rational basis, scrutiny "because it is employed as a means to punish Xcaliber for refusing to waive its" First Amendment rights by signing the MSA. Doc. 16 at 16. Under that scrutiny, the State, Xcaliber contends, "cannot establish that the Revised MEA ... [is] narrowly tailored to protect only compelling or overriding state interests." Id. at 17–18.

Fast forward to the Contracts Clause. The State's opposition to that claim fails, Xcaliber says, because demanding that parties terminate an existing agreement amounts to a constitutionally significant impairment. Doc. 16 at 4. Nor can the State show that the Revised MEA "remedies any broad and general social or economic problem, or that the" adjustment of the parties' rights is "based on reasonable conditions." Id. at 5 (quotes omitted). In any case, it notes, the State's explanations for the Revised MEA originate outside the complaint, and thus cannot be considered. Id. But first, equal protection.

### 1. *Equal Protection*

The Fourteenth Amendment to the Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." At bottom, "[t]he Equal Protection Clause requires the government to treat similarly situated persons in a similar manner." Leib v. Hillsborough Cty. Pub. Transp. Comm'n, 558 F.3d 1301, 1305 (11th Cir. 2009). "The reason that there is a 'similarly situated' requirement in the first place is that at their heart, equal protection claims ... are basically claims of discrimination. To maintain this focus on discrimination, and to avoid constitutionalizing every state regulatory dispute, [courts] are obliged to apply the 'similarly situated' requirement with rigor. 'Different treatment of dissimilarly situated persons does not violate the equal protection clause.'" Griffin Indus., Inc. v. Irvin, 496

F.3d 1189, 1207 (11th Cir. 2007); see also Miadeco Corp. v. Miami–Dade Cty., 249 F.Supp.3d 1296, 1302, 2017 WL 1319576, at *3 (S.D. Fla. Apr. 10, 2017) ("[W]here individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant ... to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued.").

▆▆▆ Assuming similarly situated persons exist, "[w]hen legislation classifies persons in such a way that they receive different treatment under the law, the degree of scrutiny the court applies depends upon the basis for the classification." Leib, 558 F.3d at 1306. "If a law treats individuals differently on the basis of race or another suspect classification, or if the law impinges on a fundamental right, it is subject to strict scrutiny. Eide v. Sarasota County, 908 F.2d 716, 722 (11th Cir. 1990)." Id. "In areas of social and economic policy," however, "a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

#### i. Similarly situated

It is one thing to say as a general matter that individuals raising equal protection challenges must share characteristics with others in order to show unequal treatment. But "what degree of similarity is required for two entities to be considered 'similarly situated,' " particularly when the challenged government decision involved multiple factors? Griffin, 496 F.3d at 1203. With "one-dimensional decision[s]," like

public utility easements or tax assessments as a percentage of market value, comparators need not be identical twins. Id. One neighborhood resident might be old, rich, and live in a mansion with a manicured lawn. His next door neighbor might live in a double-wide trailer, be twenty-five, and have a yard of knee high weeds. But if the city they live in requires the rich man to grant a thirty-three foot easement to connect to municipal water, then demands a fifteen foot one from the poor man and everyone else in the neighborhood, the discrimination—and thus the two neighbors legally relevant similarities—is palpable. See Village of Willowbrook v. Olech, 528 U.S. 562, 565, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

▆▆▆ When "regulatory action [is] ... multi-dimensional, involving varied .decisionmaking criteria," courts cannot use "a simplistic, post-hoc caricature of the decisionmaking process." Griffin, 496 F.3d at 1203. In Campbell v. Rainbow City, for example, a developer sued a city over a zoning variance denial, allegedly because the developer ran unsuccessfully against the city's mayor. 434 F.3d 1306, 1308 (11th Cir. 2006). To prevail on his equal discrimination claim the developer, who proposed building a 144–180 unit apartment complex, had to show that similar projects received approval.

He failed because his proposed comparators lacked relevant similarities. Campbell, 434 F.3d at 1316. One similarly sized development that also proposed a multifamily use for its property sought different and fewer zoning variances than Campbell. Id. at 1316. Another fell short of similarly situated at least in part because, unlike Campbell, its developer brought development plans and an engineer and architect to planning commission meetings. Id. Other comparators that the court found dissimilar were commercial, not residential,

were not "essentially the same size," had different impacts on the community, or sought different action from the city (i.e., a different zoning variance, approval from a different commission, etc.). Id. at 1316–17.

█ PMs and NPMs, like the various developments in Campbell, are not similarly situated. Both types of tobacco manufacturers deposit money into escrow accounts. But they do so for two different reasons. PMs deposit money that they contractually owe settling states under the MSA. That money remains in escrow for only a short period of time (days or weeks, not years) before transferring to the states. See doc. 1–1 at 84–85, 91.

NPMs, by contrast, escrow money for up to twenty-five years pursuant to a state statute, in part so that a reserve exists to provide for any future claims related to their tobacco products (and to preserve PM market share so that those payments continue flowing to settling states). It's true, as Xcaliber observes, that PMs and NPMs both set aside portions of their sales (doc. 16 at 10), but the escrow requirements PMs and NPMs operate under exist for different reasons. PM escrow requirements facilitate payments to states, while the NPMs' insures the availability of funds that may or may not ever transfer to the State (it also, as discussed above, eliminates any competitive advantage NPMs gained by not agreeing to the MSA). Indeed, NPMs continue to own the money they deposit—PMs as a general rule (if they dispute the amount owed, that money goes into escrow, but does not immediately transfer to the settling state) do not.

As the Tenth Circuit observed in KT&G Corp. v. Att'y Gen. of State of Okla.:

> For those manufacturers sued by [the states] for wrongdoing, the Master Settlement Agreement mandates not only strict conduct restrictions but also nonrefundable payments in perpetuity.
>
> * * *

In contrast, nonparticipating manufacturers are subject to no conduct restrictions, and their payments in escrow last for only 25 years. In addition, these manufacturers receive interest on the funds while they are held in escrow, and the principal is fully refundable if the money is not needed to pay a judgment in a tobacco-related law-suit. Thus, the refundability of the payments is directly related to the nonparticipating manufacturers' future liability for tobacco-related losses.

Thus, the distinctions between manufacturers signing the Master Settlement Agreement and manufacturers not signing are rationally related to their status *vel non* as defendants, their willingness to agree to conduct limitations, and [the states'] need to ensure a source of recovery for all future tobacco-smoking related healthcare costs. *All manufacturers thus bear responsibility in differing manners and degrees for limiting the [states'] future liability for these costs.* Those manufacturers who have not admitted to any wrongdoing and who do not wish to limit their future conduct retain the ability to manufacture and market their product in the manner they pursued before, but they essentially provide a surety bond against future liability for tobacco-smoking related healthcare costs.

535 F.3d 1114, 1139–40 (10th Cir. 2008) (quoting Star Scientific, Inc. v. Beales, 278 F.3d 339, 351–52 (4th Cir. 2002) (emphasis added)).

█ Again, valid comparators, for equal protection purposes, must be "similarly situated *in all relevant respects.*" Griffin, 496 F.3d at 1204 (emphasis in original). PMs and NPMs simply aren't. Yes, they both manufacture tobacco products. Yes, they both deposit money in escrow accounts. Those, however, are irrelevant similarities

when evaluating whether the Revised MEA violates equal protection because they have no bearing on that question or its answer. See id. at 1203.

The only relevant similarities (in this case, differences) in evaluating whether the Revised MEA violates the Equal Protection Clause are those surrounding a given manufacturer's relationship to the MSA and "their status *vel non* as defendants." KT&G, 535 F.3d at 1140; see also id. ("Thus, the refundability of the payments is directly related to the [NPMs'] future liability for tobacco-related losses."). The MSA mandates PM payments. It limits PM conduct, and provides other safeguards (contractual remedies) the State may rely on. Without the escrow statutes (and its implementing devices, like the Revised MEA, annual compliance certifications, delisiting, and noncompliance fines), no similar mechanisms exist to ensure that NPMs remain able to fund any claims related to the healthcare costs their products create.

Like employees alleging workplace discrimination, who "may perform similar functions in different ways," and thus may generate different employer treatment, two otherwise similar tobacco product manufacturers may stand in different positions vis-a-vis the MSA and thus, too, their potential liability for future tobacco-related health care costs. Griffin, 496 F.3d at 1204 (citing Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316–19 (11th Cir. 2003)). Those differences, just like two employees' different punctuality standards, in turn justify differential treatment by the State. That creates differential situations, and that dooms Xcaliber's equal protection claim.

### ii. Heightened Scrutiny

Even if PMs and NPMs are similarly situated, the Revised MEA is rationally related to the legitimate state interests of promoting health and recovering costs for tobacco-related illnesses. See Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 175 (2d Cir. 2005). Implicit in that conclusion: heightened scrutiny does not apply because the Revised MEA does not compel or "needlessly encourage" Xcaliber to sign the MSA and agree to limitations on its commercial speech rights, or penalize it for not doing so.

Xcaliber argues that the Revised MEA's investment restrictions impose a disproportionate financial burden on NPMs by reducing returns on escrowed funds, all in an effort to punish them for not signing the MSA. Doc. 16 at 16. Disproportionate to what though? Certainly not PMs, who must pay settling states money they will never .get back. See KT&G, 535 F.3d at 1135 ("Plaintiffs are no worse off financially than if they had joined the MSA."). NPMs, by contrast, eventually receive every penny back of the money they escrow, assuming of course that no claims eat away at those funds. What's more, NPMs place in escrow no more than PMs pay under the MSA. If they do deposit more than they would have paid, the excess is refunded (at least that's what the statutory scheme provides for).

A simple example illustrates how the Revised MEA places no greater burden on NPMs than PMs suffer under the MSA. Imagine an NPM that pays $100 into escrow. It owns those funds, and even under the Revised MEA, it earns interest income (if slightly less, *maybe*, than it would have under the original MEA) on them until their eventual return twenty-five years down the road (again, assuming no claims are made against the deposits). Here's the kicker though: the NPM retains the ability to advertise as it sees fit.

Had the NPM signed the MSA, it would have paid approximately the same $100, but to the states, not into its own escrow

account. It would never get that money back, claim or no claim. And, it would labor under advertising restrictions in perpetuity.

If no claims were ever made on the escrowed funds, the NPM who never signed the MSA would recover its $100, plus twenty-five years worth of interest. The signing NPM would be out $100 and would have earned almost no interest. Even if the non-signing NPM earned zero interest income, they would still be in a better position than a signatory *and* they would retain their First Amendment rights. If any party in that equation suffers a disproportionate financial burden, it's the NPM who became a PM and signed the MSA.

Because the escrow statute itself places no burden on NPMs beyond those PMs suffer, the Revised MEA, by reducing (but not eliminating), an NPMs interest income, does not compel or "needlessly encourage" NPMs to sign the MSA and forfeit their First Amendment rights. Heightened scrutiny thus does not apply to Xcaliber's equal protection claim.

### iii. Rational basis

 Instead, the Court must assess whether "there is any reasonably conceivable state of facts that could provide a rational basis for the classification," in this case the Revised MEA's restrictions of NPM escrow investments. Beach Communications, 508 U.S. at 313, 113 S.Ct. 2096. "[T]hat rational-basis review," however, "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." Heller v. Doe, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). "A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification." Id. at 320, 113 S.Ct. 2637. In fact, a "legislative choice" like the Revised MEA (again, as discussed below, the Attorney General had statutory authority to promulgate the agreement)

"may be based on rational speculation unsupported by evidence or empirical data." Id.

As noted above, escrow statutes like Georgia's are "rationally related to a legitimate state interest: promoting public health and recovering the costs of tobacco-related illnesses." Pryor, 425 F.3d at 175. Georgia's "non-diminishment" amendment in turn is itself rationally related to those goals because it protects escrowed funds—the monetary backstop for possible future claims—from depletion. The dispute here is whether the Revised MEA is rationally related to the legitimate goal of protecting escrowed money.

It is. The State says that it is "designed to ensure that [escrow] funds maintain their required value . . . and can be readily converted to cash, if needed, to pay a qualifying judgment." Doc. 14–1 at 6–7; see also doc. 1–2 at 2 (letter from the Attorney General to all NPMs, attached to Xcaliber's complaint, stating that the bond requirement and Revised MEA were created because of the non-diminishment amendment to Georgia's escrow statute). The State need produce no evidence supporting that reason (and since it appears in materials attached to the complaint, considering it violates no 12(b)(6) principle). Heller, 509 U.S. at 319, 113 S.Ct. 2637. Indeed, so long as it amounts to "rational speculation," this Court cannot second guess. Id. In fact, so long as any "reasonably conceivable" reason exists, the Court must uphold the Revised MEA. Beach Communications, 508 U.S. at 313, 113 S.Ct. 2096.

Rational basis created "restraints on judicial review," moreover, "have added force where the legislature must necessarily engage in a process of line-drawing." Beach Communications, 508 U.S. at 315, 113 S.Ct. 2096. In deciding what types of investments would satisfy the non-dimin-

ishment requirement, the Attorney General necessarily had to conclude that some investments fell within acceptable ranges, while others did not. This Court cannot now second guess where those lines fell. Indeed, that "necessity renders the precise coordinates of the resulting legislative judgment virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally." Id. at 316, 113 S.Ct. 2096. That the Attorney General made the relevant judgment in this case is, as discussed below, irrelevant, since the Georgia Legislature delegated review and approval, and rulemaking, authority to that office.

■■■ Xcaliber argues that the Revised MEA is a "naked attempt to favor" PMs, presumably by disadvantaging their competitors who haven't signed the MSA, and who thus do not funnel money to the States. Doc. 16 at 15. That is not irrational or even implausible, but it is not the only possibility either, much less one supported by evidence.

Georgia's escrow statute changed in April 2016, effective July 1, 2016. The Attorney General then changed the MEA in a way that rationally relates to the statutory alteration. Absent more, the Court cannot presume a nefarious purpose.

The Court need not determine the wisdom of the State's decision because wisdom is not the touchstone of rational basis inquiry. Rationality is. And the Attorney General's choice to limit exclude Ginnie Mae-type bonds from permitted escrow investments falls into that broad spectrum. Even if PMs and NPMs are similarly situated (they're not), Xcaliber's equal protection claim therefore fails.

So too does Xcaliber's argument that the State's justifications for the Revised MEA fall "beyond the four corners of the Complaint." Doc. 16 at 11. None of the State's justifications (or, for that matter, the factual grounds for the Court's substantial

similarity reasoning) originate outside the complaint and its attachments. The Revised MEA, Georgia's Qualifying Statute, various regulations (see, e.g., doc. 14–1 at 15–17 (listing many of those regulations and highlighting the complaint's allegations that underlay the State's rational basis arguments)), and documents attached to Xcaliber's complaint (see, e.g., doc. 1–2) provide the factual underpinnings for those rational bases. *That* is what matters on a motion to dismiss. The complaint need not also contain the very rational bases arguments the State makes in its motion to dismiss.

Yet, that is what Xcaliber insists is lacking, and what it says justifies allowing discovery in this case. Such a position inverts the fact/conclusion hierarchy and cannot pave the road to discovery. See Bishop v. Ross Earle & Bonan, P.A., 817 F.3d 1268, 1270 (11th Cir. 2016) (legal conclusions cannot state a claim). Regardless, PMs and NPMs like Xcaliber are not similarly situated. No matter the procedural propriety of considering the State's rational basis arguments, then, Xcaliber's equal protection claim fails.

### 2. Contract Impairment

Article I, Section 10, clause 1 of the United States Constitution provides that "[n]o State shall … pass any … Law impairing the Obligation of Contracts …." That "Clause is not, however, the Draconian provision that its words might seem to imply." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 240, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). Indeed, " 'literalism in the construction of the contract clause … would make it destructive of the public interest by depriving the State of its prerogative of self-protection.' " Id. (quoting W. B. Worthen Co. v. Thomas, 292 U.S. 426, 433, 54 S.Ct. 816, 78 L.Ed. 1344 (1934)).

For one, the Contract Clause " 'does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected.' " Id. at 241, 98 S.Ct. 2716 (quoting Manigault v. Springs, 199 U.S. 473, 480, 26 S.Ct. 127, 50 L.Ed. 274 (1905)). Put differently, " '[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject-matter.' " Id. (quoting Hudson Water Co. v. McCarter, 209 U.S. 349, 357, 28 S.Ct. 529, 52 L.Ed. 828 (1908)). Nevertheless, states' "sovereign power ... to safeguard the welfare of their citizens ... has limits when its exercise effects substantial modifications of private contracts." Id. at 244, 98 S.Ct. 2716 (citing United States Trust Co. v. New Jersey, 431 U.S. 1, 21, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)).

"The threshold inquiry [thus] is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." Energy Reserves Grp., Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (quotes omitted).

Total destruction of contractual expectations is not necessary for a finding of substantial impairment. United States Trust Co., 431 U.S. at 26–27, 97 S.Ct. at 1519–1520. On the other hand, state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment. Id., at 31, 97 S.Ct. at 1522, citing El Paso v. Simmons, 379 U.S. 497, 515, 85 S.Ct. 577, 587, 13 L.Ed.2d 446 (1965). In determining the extent of the impairment, we are to consider whether the industry the complain-ing party has entered has been regulated in the past. Allied Structural Steel Co., 438 U.S. at 242, n. 13, 98 S.Ct. at 2721, n. 13, citing Veix v. Sixth Ward Bldg. & Loan Ass'n, 310 U.S. 32, 38, 60 S.Ct. 792, 794–795, 84 L.Ed. 1061 (1940) ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic").

Id.

If a state law substantially impairs a contractual relationship, the State "must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." Id. at 411–12, 103 S.Ct. 697 (cites omitted). "Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." Id. at 412, 103 S.Ct. 697 (alterations in original, quotes omitted). "Unless the State itself is a contracting party, [a]s is customary in reviewing economic and social regulation, ... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." Id. at 412–13, 103 S.Ct. 697 (alteration in original).

### i. Substantial impairment

Xcaliber argues that "[t]he degree of impairment" in this case "could not be higher" since the Revised MEA's imposition is a demand that Xcaliber terminate its existing escrow contract and enter into a new one. Doc. 16 at 4. The State admits that the Revised MEA requires Xcaliber to change an existing contract. But it insists that the new agreement does not amount to a "substantial impairment" be-

cause its restrictions "constitute a rule of conduct" with only an "incidental" effect on Xcaliber's escrow agreement. Doc. 14–1 at 20.

Xcaliber is correct—imposition of the Revised MEA and its investment restrictions *does* force it to modify its existing escrow agreement if it wants to continue selling tobacco products in Georgia. In a literal sense, then, the Revised MEA impairs Xcaliber's current contractual right to invest in Ginnie Mae bonds. And if literalism animated the Contract Clause, that would answer the first prong of the analysis. It doesn't though. See W.B. Worthen Co., 292 U.S. at 433, 54 S.Ct. 816 ("[L]iteralism in the construction of the contract clause ... would make it destructive of the public interest by depriving the State of its prerogative of self-protection."); Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 434–35, 54 S.Ct. 231, 78 L.Ed. 413 (1934) (state authority "to safeguard the vital interests of its people" remains no "matter that legislation appropriate to that end has the result of modifying or abrogating contracts already in effect") (quotes omitted).

Instead, impairment severity is measured in context. In Allied Structural Steel, for example, the Court invalidated a Minnesota law that retroactively modified pension compensation that private companies owed their employees pursuant to a private contract. 438 U.S. at 245, 98 S.Ct. 2716. "Not only did the state law ... retroactively modify ... compensation," noted the Court in finding a severe impairment, "it did so by changing the company's obligations in an area where the element of reliance was vital." Id.

Too, that change came to a contract that satisfied "the federal income tax code and was subject to no other legislative require-

ments." Allied Structural Steel, 438 U.S. at 245, 98 S.Ct. 2716. The company "thus had no reason to anticipate" the changes the law wrought. Id. at 245–46, 98 S.Ct. 2716. The company "relied heavily, and reasonably, on [its] legitimate contractual expectation" and the statute's nullification of those expectations constituted a severe impairment. Id. at 246–47, 98 S.Ct. 2716; see also Vesta Fire Ins. Corp. v. Florida, 141 F.3d 1427, 1433 (11th Cir. 1998) (state law which "prohibited the nonrenewal and cancellation of residential line insurance policies for reasons related to the risk of hurricane damage" substantially impaired insurance company's expectations by forcing it to "continue contractual relationships that otherwise ... could be rightfully terminated").[4]

In Energy Reserves Group, by contrast, a state law that prevented a natural gas producer from charging higher prices than its contract allowed for fell short of a severe impairment. 459 U.S. at 414–16, 103 S.Ct. 697. "Significant" in that case "[was] the fact that the parties [were] operating in a heavily regulated industry." Id. at 413, 103 S.Ct. 697. Indeed, "[t]he very existence" of the impaired contract clauses (which triggered pricing changes in response to state price regulation) "indicate[d] that the contracts were structured against the background of" state rules, not to mention that "the contracts expressly recognize[d] the existence of extensive regulation." Id. at 415–16, 103 S.Ct. 697. "In short," held the Court, the company's "reasonable expectations have not been impaired by the" state law. Id. at 416, 103 S.Ct. 697.

■ Here, imposition of the Revised MEA forces Xcaliber to modify the permitted investments provision in its escrow

---

4. Worth noting, the Eleventh Circuit ultimately upheld the state law in Vesta Fire, despite finding a severe impairment, because the Florida legislature's judgment in enacting the provision mandated deference. Vesta Fire, 141 F.3d at 1434.

agreement. Its current agreement allows investment in Ginnie Mae-style bonds. Moving forward, the Revised MEA will not. Consequently, says Xcaliber, if the State imposes the Revised MEA, Xcaliber will not be able to earn returns on its escrowed funds as high as it could under the original model agreement. Doc. 14–1 at 7.

Like the natural gas contracts in Energy Reserves though, Xcaliber's current escrow agreement explicitly recognizes the MSA, attendant state regulation of NPMs, and, specifically, escrow statutes like Georgia's. Doc. 1–5 at 2. The contract even recites portions of that statute in appointing the International Bank of Commerce (IBC) as Xcaliber's escrow agent. Id. (IBC warranting that it meets the requirements of O.C.G.A. § 10–13–2(7)). It also requires both Xcaliber and IBC to send to the Attorney General certain information about escrow deposits. See, e.g., doc. 1–5 at 6. In fact, by including a clause requiring Xcaliber to provide IBC a copy of Georgia's escrow statute—which changed *after* the contract's execution—the contract arguably suggests that Xcaliber "knew its rights were subject to alteration by state . . . regulation." Energy Reserves, 459 U.S. at 416, 103 S.Ct. 697.

Xcaliber contends that the Revised MEA upsets long-settled contractual expectations and thus amounts to a severe impairment. But only *reasonable* expectations and reliance can undergird unconstitutional contract interference. See Energy Reserves, 459 U.S. at 416, 103 S.Ct. 697 ("ERG's reasonable expectations have no been impaired by the Kansas Act."). Xcaliber, unlike the company in Allied Structural Steel whose reliance interests faced no state regulatory matrix and who thus suffered an unconstitutional impairment when the state suddenly obliterated those interests, knew from the time it executed its current escrow agreement that tobacco manufacturing and sales are heavily regulated. It knew—and, indeed, acknowledged in the escrow agreement (doc. 1–5 at 2)— that it had to comply with Georgia's escrow statute, which it knew could change. When it did change in April 2016 to require *no diminution in the value of invested funds*,[5] Xcaliber knew (or should have known) that changes in permitted investments might be coming down the pipe. Put differently, and given the Attorney General's statutory responsibility for reviewing and approving escrow agreements, and issuing rules and regulations enforcing Georgia's escrow statute, the Revised MEA (if not its precise contents) should not have surprised Xcaliber.

Any impact it has on Xcaliber's reasonable reliance interests is, in any event, muted by the agreement's "grandfather clause." That provision allows Xcaliber's current investments to remain in Ginnie Mae bonds. Only new investments are subject to the Revised MEA's restrictions. See doc. 1–6 at 13 ("If the Company has preexisting investments that are not Permitted Investments under this Escrow Agreement, but were permitted under the prior escrow agreement, the Company may continue to own these specific investments until they mature or are sold by the Company.").

Unlike the Minnesota law in Allied Structural Steel, then, the Revised MEA does not apply retroactively. 438 U.S. at 246, 98 S.Ct. 2716; see also W.B. Worthen Co. v. Thomas, 292 U.S. 426, 431–32, 54 S.Ct. 816, 78 L.Ed. 1344 (1934) (state exemption of life insurance policy proceeds from creditor liens, "applied in the case of debts owing before the exemption was

---

**5.** Xcaliber never suggests that that addition to the escrow statute itself contains constitution-

al shortcomings.

created by the Legislature, constitutes an unwarrantable interference with the obligation of contracts in violation of the constitutional provision"). In other words, it does not upset investments Xcaliber made in reliance on its existing escrow contract; rather, it alters only future expectations and investment strategies.[6]

As noted, the Revised MEA forces IBC and Xcaliber to change one paragraph of their existing agreement. But again, mere effect is not the touchstone of an impairment analysis. See Allied Structural Steel, 438 U.S. at 241, 98 S.Ct. 2716 (the Contract Clause " 'does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected' ").[7] It only applies prospectively (it upends no existing investments), and serves as but one piece of a complex regulatory web within which Xcaliber must operate. "In short, [Xcaliber's] reasonable expectations," which it "structured against the background of . . . extensive [state] regulation," "have not been impaired by the [Revised MEA]." Energy Reserves, 459 U.S. at 416, 103 S.Ct. 697.[8] Because none of its interests suffer in

constitutionally significant ways, Xcaliber's Contracts Clause claim fails.

### ii. State interest in impairment

■ "To the extent, if any, the [Revised MEA] impairs [Xcaliber's] contractual interests, the [Revised MEA] rests on, and its prompted by, significant and legitimate state interests." Energy Reserves, 459 U.S. at 416, 103 S.Ct. 697. Recall that the MSA arose from lawsuits over the healthcare costs tobacco products imposed on state healthcare budgets. Doc. 1 at 4. By extension (one explicitly recognized), those same healthcare concerns also animate state escrow statutes like Georgia's (including its new "non-diminishment" provisions), and, by further extension, the Attorney General's attempts to implement and promote compliance with that statute. See O.C.G.A. § 10–13–1. And protecting citizen health (in this case by ensuring a source of recovery for future tobacco-related health claims) lies at the core of a state's legitimate police power. It thus qualifies as a "significant and legitimate state interest." See KT&G Corp v. Att'y Gen. of State of Okla., 535 F.3d 1114, 1140 (10th Cir. 2008); Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 175 (2d Cir. 2005) (equal protection and substantive due process claims found "una-

---

**6.** The same can be said of many laws that withstand constitutional scrutiny. Indeed, the State would face no Contracts Clause obstacle (though its citizenry might protest) in passing a law that bans tobacco sales completely. That, *far* more than the Revised MEA, would likely upset Xcaliber's contractual expectations with a whole host of entities, not just its escrow account provider.

**7.** Although it did not have to rewrite a contract provision as the Revised MEA requires of Xcaliber, Allied Structural Steel in a very real sense suffered more. The Minnesota law it objected to fundamentally changed its pension payment system and retroactively forced it to pay money to previously excluded retirees. The Revised MEA, by contrast, alters nothing about an escrow agreement's super-

structure or how much Xcaliber must pay into escrow.

**8.** The law challenged in Energy Reserves, but not the one at issue in Allied Structural Steel, contained a "sunset" provision limiting the amount of time it was in effect. No such limitation attaches to the Revised MEA. Although the temporary or emergency nature of state's law bolsters its constitutionality, see Allied Structural Steel, 438 U.S. at 250, 98 S.Ct. 2716, that is just one possible fact that can influence a Contract Clause analysis. See id. at 242, 98 S.Ct. 2716. Even where, as here, a law effects a permanent change to certain contracts, it may still fall short of a substantial impairment if it lightly impacts a contracting party's reasonable expectations. Energy Reserves, 459 U.S. at 411, 103 S.Ct. 697.

vailing because the Escrow Statutes are rationally related to a legitimate state interest: promoting public health and recovering the costs of tobacco-related illnesses"); Star Scientific, Inc. v. Beales, 278 F.3d 339, 352 (4th Cir. 2002) (same).

Xcaliber contends that the Revised MEA's investment restrictions aim to protect PMs from NPM market share encroachment, not undergird the state's interest in healthcare. See doc. 16 at 6. Certainly the MSA acknowledges that qualifying escrow statutes are those that "effectively and fully neutralize[ ] the cost disadvantages that the [PMs] experience . . . as a result of [its] provisions." Doc. 1–1 at 60. Considered alone, that suggests the purpose of Georgia's statute, and thus the Revised MEA, is to buck up PMs, not provide for public health. As per usual, however, context is king.

Reducing NPM cost advantages vis-a-vis PMs serves a larger purpose. It helps ensure that PMs continue to compete on a level playing field, which in turn safeguards their ability to make MSA payments. *That* protects public health, which, as discussed above, is undeniably a "broad and general social" issue which the State's police power may legitimately address.

Whether the Revised MEA goes beyond Georgia's codified requirements, and even if it serves to protect PMs, it nevertheless remains aimed at preserving PM viability and thus their MSA payments to the State. Those benefit public health—as does the mere presence of a guaranteed fund to pay for any future claims against NPMs—and the Revised MEA's support for them thus serves a "legitimate public purpose." Energy Reserves Group, 459 U.S. at 412, 103 S.Ct. 697.

Still, the mechanism (the Revised MEA) by which that purpose is served must be of an appropriate character and based "upon reasonable conditions." Id. In evaluating that requirement, the Court must "properly defer to legislative judgment as to . . . reasonableness," [9] since Georgia is not a party to the escrow agreement allegedly impaired. Energy Reserves Group, 459 U.S. at 413, 103 S.Ct. 697.

The Georgia Legislature has determined that NPMs should be required to escrow certain funds. O.C.G.A. § 10–13–1. Why? In order to neutralize NPM cost advantages over PMs, which NPMs might use to "derive large, short-term profits in the years before [their tobacco illness-related] liability may arise." Id. at (f). By the legislature's measure, an escrow system will best "guarantee a source of compensation" and "prevent [NPMs] from deriving" those profits "and then becoming judgment-proof before liability may arise." Id. The Attorney General in turn is tasked with reviewing and approving escrow agreements to ensure they satisfy statutory mandates, including that escrowed funds' principal balance never diminishes as a result of soured investments. O.C.G.A. § 10–13A–3(d). He also may promulgate rules and regulations to implement the escrow statute, including its "non-diminishment" requirements. O.C.G.A. § 10–13A–10(c). Exercising the discretion inherent in those legislative instructions, the Attorney General has decided that the Revised MEA best enables him to ensure that NPM escrow agreements satisfy that "non-diminishment" principle.

Xcaliber offers no viable reason to discount that logical progression,[10] particular-

---

**9.** As discussed more fully below, because the Attorney General's promulgation of the Revised MEA is not an *ultra vires* act (*i.e.,* he possesses statutory authority to require adherence), the Court owes deference to the Geor-

gia Legislature's judgment as embodied in the relevant statutory scheme.

**10.** Xcaliber, in its equal protection arguments, contends that the Revised MEA's in-

ly in light of the deference owed legislative findings and the decision to delegate review and rulemaking authority to the Attorney General. Hence, the State rationally imposed the Revised MEA on NPMs like Xcaliber in order to remedy the very real social problem of tobacco-related illnesses and the healthcare costs they create. Substantial impairment of Xcaliber's existing escrow agreement or not, the Revised MEA does not violate the Constitution's Contract Clause.

### 3. *Ultra Vires*

Xcaliber contends that the Attorney General's "exceeded his express constitutional and statutory powers by forcing [it to adopt] the Revised [MEA]." Doc. 16 at 18. Because he may only review and approve an NPM's escrow agreement, says Xcaliber, imposing additional requirements on the investments of an NPM's escrowed funds amounts to an *ultra vires* act.

 Government "action contrary to ... statute which" a governmental entity has "no power to take" is *ultra vires* (beyond one's legal authority) and void. City of Holly Springs v. Cherokee Cty., 299 Ga.App. 451, 457, 682 S.E.2d 644 (2009) (quoting Quillian v. Employees' Retirement Sys. of Ga., 259 ·Ga. 253, 255, 379 S.E.2d 515 (1989)). But there is a "broad distinction ... between an irregular exercise of a granted power, and the total absence or want of power." Id. Only in the

latter circumstance does an action qualify as *ultra vires* under Georgia law.

In City of Smyrna v. Adams, Smyrna "purported to annex two parcels of land." 255 Ga.App. 453, 565 S.E.2d 606 (2002). That annexation's propriety turned on whether the city properly annexed South Cobb Drive on or before January 1, 1991. Id. The city asserted that annexation of the road occurred in 1985, while Adams claimed that it happened in April 1991, too late for the land annexation to be effective. Id. The court then examined annexation law from 1985 and found that Smyrna could have legally annexed the road in three ways. Id. at 454, 565 S.E.2d 606. Because its purported annexation did not follow any of the three available methods, it amounted to an *ultra vires* act that could not undergird the later land annexation. Id.

 Promulgating the Revised MEA, by contrast, did not exceed the Attorney General's authority under the escrow statute. Georgia law requires him to, among other things, "perform such other services as shall be required of him by law." O.C.G.A. § 45–15–3(7). The escrow statute in turn requires some of those "other services." Id. For example, "[t]o promote compliance" with that statute, including with O.C.G.A. § 10–13A–2(14)'s "non-diminishment" requirement, the Attorney General may promulgate regulations. O.C.G.A. § 10–13A–8(f); see also O.C.G.A.

vestment restrictions have no legitimate purpose because they provide no greater non-diminishment protection than existing limitations. Maybe that's factually accurate. Even so, it's not factually obvious (a rational observer could easily conclude that nongovernment corporate bond investments, even those nominally backed by the federal government, pose higher risk than cash or short-term treasuries).

Regardless, the state need not provide *any* reason; there need only exist a reasonably conceivable state of facts that justify a given

state action. Hence, the Revised MEA rests comfortably within the broad range of means available to the State to achieve its desired ends and thus cannot be overturned. See KT&G, 535 F.3d at 1138 ("[W]e will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish, or because the statute's classifications lack razor-sharp precision. Nor can we overturn a statute on the basis that no empirical evidence supports the assumptions underlying the legislative choice.").

§ 10–13A–10(c) ("The Attorney General may promulgate rules and regulations necessary to effect the purposes of this chapter."). He also is empowered to review and approve proposed qualified escrow agreements. O.C.G.A. § 10–13A–3(d)(2).

The Revised MEA represents nothing more than the Attorney General "promulgat[ing]" a rule "to effect the purposes" of the escrow statute. O.C.G.A. § 10–13A–10(c); O.C.G.A. § 50–13–2(6) (" 'Rule' means each agency regulation, standard, or statement of general applicability that implements, interprets, or prescribes law or policy or describes the organization, procedure, or practice requirements of any agency.").[11] Specifically, the Revised MEA serves to "effect" O.C.G.A. § 10–13A–2(14)'s "non-diminishment" requirement. Whether the Revised MEA's investment restrictions in fact enhance the stability of an escrow fund's principal balance, they do target that goal. Doing so removes them from the *ultra vires* realm since (1) "non-diminishment" is a statutorily prescribed requirement for qualified escrow funds, and (2) the Attorney General has authority to enact rules to promote compliance with such mandates.

The Revised MEA may also qualify as nothing more than an exercise of the Attorney General's authority to review and approve escrow agreements. To review something is to "to go over or examine [it] critically or deliberately."[12] And to approve it is to "give formal or official sanction."[13] When combined, review and approval authority suggest that the Attorney General can effectively dictate the terms of escrow agreements, so long as they further the escrow statute's aims. He can critically examine a proposed investment limitation, for example, and, after considering the escrow statute's non-diminishment mandate, decide to withhold his official sanction. That's nothing more than the inverse of telling a tobacco product manufacturer that only certain investments will receive official approval. Much like the Commerce Clause of the Constitution contains a dormant or negative counterpart,[14] review-and-approve authority likewise contains an implicit power to delineate the agreement terms that will receive official sanction. At worst, use of the review authority to dictate terms represents an "irregular exercise of a granted power." City of Holly Springs, 299 Ga.App. at 457, 682 S.E.2d 644; see also id. ("[T]he city's failure to finalize the annexation by adopting the ordinance, preparing a survey, and filing it with the Secretary of State was a mistake or error of omission. It was not an action contrary to the statute which the city had no power to take, but 'simply making a mistake during an otherwise authorized action under the' statute.").

11. The Attorney General, as head of the Georgia Department of Law, constitutes an "agency" for purposes of the Georgia Administrative Procedures Act. O.C.G.A. § 50–13–2(1) (" 'Agency' means each state ... department ... or officer authorized by law expressly to make rules and regulations ....").

12. "Review." Merriam–Webster Online Dictionary. https://www.merriam-webster.com/dictionary/review (January 18, 2017).

13. "Approve" Merriam–Webster Online Dictionary. https://www.merriam-webster.com/dictionary/approve (January 18, 2017).

14. See Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 337, 128 S.Ct. 1801, 170 L.Ed.2d 685 (2008) ("The Commerce Clause empowers Congress '[t]o regulate Commerce ... among the several States,' Art. I, § 8, cl. 3, and although its terms do not expressly restrain "the several States" in any way, we have sensed a negative implication in the provision since the early days") (alterations in original).

Adams underscores that conclusion. There, the city had three starkly defined avenues by which it could annex land. It did not follow any of them. The actions it later characterized as annexation thus were *ultra vires*. Here, however, the Attorney General had broad authority to issue rules he saw as necessary to effect the purposes of the escrow statute and promote compliance with its provisions, which include the "non-diminishment" requirement.

Taken to its logical extreme, Xcaliber's position would neuter Georgia executive agencies' authority to promulgate rules and regulations. An illustrative example: Statute A regulates power plant emissions. It bans the burning of fossil fuels, mandates that power producers maintain energy production at current levels, and gives power to the Georgia Public Service Commission to issue rules to effect its purposes.

Applying Xcaliber's arguments to that hypothetical, a PSC rule that required solar power to account for at least 25% of a producers output would qualify as *ultra vires* simply because the original statute said nothing about solar power or otherwise limited a producer's power generation portfolio beyond the fossil fuel ban. In more general terms, Xcaliber's position says rulemaking qualifies as *ultra vires* when that authority is paired with ambiguous statutory text.

That, however, is the very essence of rulemaking. A legislative body expresses a broad principle. It then taps an executive entity to flesh out the specifics. States and the federal government use that model daily (much to the chagrin of those who believe in stark separation of powers). And that's what Georgia did with its escrow statute. Nothing about that mechanism renders the Revised MEA's issuance *ultra vires*.

Maybe the Attorney General did not follow proper procedures in issuing the rule. Maybe the rule is ill-advised. Maybe it's not a rule at all. But whatever else may be said about the Revised MEA, it cannot be said that it came about in the "total absence or want of power." City of Holly Springs, 299 Ga.App. at 457, 682 S.E.2d 644. Xcaliber's *ultra vires* claim thus fails.[15]

## B. Equal Protection—Escrow Rules

Xcaliber's fourth claim asserts that certain regulatory provisions imposed on NPMs, but not PMs, result in unequal protection. Doc. 1 at 26–28. PMs, contends Xcaliber, avoid for no rational reason quarterly escrow deposits, appointing and maintaining an agent for service of process, posting a bond, and the threat of decertification to sell in Georgia if escrow deposits are not paid. Id. at 27. In fact, "the Attorney General has an equal interest in guarantying" PM and NPM deposits

---

**15.** Because the Court finds that the Attorney General had statutory authority to promulgate the Revised MEA, it need not address the State's argument that sovereign immunity bars injunctive relief (doc. 14–1 at 23), an issue that the Georgia Supreme Court may not have yet decided. Compare State v. Int'l Keystone Knights of the Ku Klux Klan, Inc., 299 Ga. 392, 396 n. 11, 788 S.E.2d 455 (2016) ("[W]e have not had occasion to consider the extent to which the doctrine of sovereign immunity bars claims for injunctive or declaratory relief from state action that is alleged to

be unconstitutional.") (citing Olvera v. Univ. System of Ga. Bd. of Regents, 298 Ga. 425, 428, n. 3, 782 S.E.2d 436 (2016)), with Ga. Dep't of Nat. Resources v. Center for a Sustainable Coast, Inc., 294 Ga. 593, 755 S.E.2d 184, (2014) (sovereign immunity barred injunction against state agency that would have prohibited it from sending "letters of permission" to land developers, where plaintiff argued that such letters violated Georgia law). Xcaliber's motion to certify that issue to the Georgia Supreme Court therefore is **DENIED AS MOOT**. Doc. 17.

on a quarterly basis; guarantying payment via a bond; removing both from the approved manufacturer directory if they fail to pay; and serving process on both NPMs and PMs. Id. at 28. Yet, the State, Xcaliber notes, shackles only NPMs. Id. at 30. Because doing so furthers no compelling or legitimate state interest, the regulations, in Xcaliber's view, violate the Equal Protection Clause. Id. at 28–29.

For the same reasons the Revised MEA Equal Protection claim fails, so too does Xcaliber's regulation-based cause of action. Most importantly, PMs and NPMs, for the reasons outlined above, are not similarly situated (that alone kiboshes the claim). Were that not enough, the State has ample reason to require a bond, quarterly deposits, maintenance of an agent for service, and to threaten directory removal for non-payment of escrow deposits. PMs deposit money that belongs to the state. NPM deposits remain their property unless claims crop up. That ownership difference alone justifies a bond requirement, for example. But other PM and NPM differences, namely those surrounding a given manufacturer's relationship to the MSA and "their status *vel non* as defendants," [16] justify different regulatory treatment, too.

PMs have contractual obligations to the State because they signed the MSA. NPMs like Xcaliber do not. That provides the State extra protections—*i.e.*, it bears less risk of PM non-payment, timely payment, etc.—that it lacks with NPMs. And those justify quarterly payments for NPMs while allowing PMs to pay once a year, as well as directory removal (contractual remedies replace the threat of removal as the State's leverage over PMs), and the registered agent requirement (PMs, but not NPMs, have consented to the jurisdiction of Georgia courts). But again, the dissimilarities between NPMs and PMs dooms Xcaliber's regulatory equal

protection claim in any event, rational basis for the differential treatment or not. See Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1207 (11th Cir. 2007).

## IV. CONCLUSION

Because all of Xcaliber's causes of action fail to state claims, Georgia's motion to dismiss is **GRANTED**. Doc. 14. Xcaliber's motion to certify a question is **DENIED.** Doc. 17. The Clerk is **DIRECTED** to close this case.

**SO ORDERED,** this 30th day of May 2017.

---

**16.** KT&G Corp. v. Att'y Gen. of State of Okla., 535 F.3d 1114, 1140 (10th Cir. 2008).